IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZETTE M. BUMBARGER, | ) | CIVIL ACTION NO. 3:14-137 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| NEW ENTERPRISE STONE AND | ) | |
| LIME CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

I.     Introduction

Pending before the Court is a motion for summary judgment (ECF No. 24) filed by Defendant New Enterprise Stone and Lime Co., Inc., with respect to all claims asserted in Plaintiff Suzette M. Bumbarger's amended complaint filed on July 2, 2014, (ECF No. 2). Plaintiff's amended complaint alleges claims for a hostile work environment, constructive discharge, wrongful failure to promote, and retaliation, under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1]  Also pending before the Court is Defendant's motion to strike portions of Plaintiff's affidavit (ECF No. 35) and Defendant's motion to strike Monica Graham's affidavit (ECF No. 37).  These matters have been fully briefed (*see* ECF Nos. 25, 26, 29, 30, 33, 34, 36, 38, 39, 40) and are ready for disposition.  For the reasons that follow, Defendant's motion to strike portions of Plaintiff's affidavit will be **GRANTED in part** and

---

[1] Plaintiff has withdrawn her failure to promote claim.  (ECF No. 29 at 80.)

**DENIED in part**.  Defendant's motion to strike Ms. Graham's affidavit will be **DENIED**.

Defendant's motion for summary judgment will be **GRANTED**.

## II.  Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper under 28 U.S.C. § 1391(b).

## III.  Procedural and Factual Background

Defendant is a building materials supplier and highway contractor that operates quarries and blacktop and concrete-mix plans in Pennsylvania and performs highway construction and roadway paving projects on a seasonal basis.  (ECF Nos. 25 ¶ 1; 30 ¶ 1.) Plaintiff was hired as a part-time flagger for Defendant on a seasonal basis in May 2005 and was hired as a full-time laborer in August 2009.  (ECF Nos. 25 ¶ 2; 30 ¶ 2.)  When Plaintiff transferred to her position as a full-time laborer in August 2009, she was assigned to the roadway construction crew for which Gregory Stamm, Defendant's former employee, served as a crew superintendent.  (ECF Nos. 25 ¶ 3; 30 ¶ 3; 33 ¶ 3.)  As a laborer, Plaintiff diverted traffic during roadway paving.  (ECF Nos. 30 ¶ 351; 33 ¶ 351.) Plaintiff's base rate of pay was $18.00 per hour, and on prevailing wage jobs, her rate of pay was approximately $22.00 per hour. (ECF Nos. 25 ¶ 5; 30 ¶ 5.)  Plaintiff continued to be employed by Defendant on a full-time, seasonal basis until she resigned from her position on June 17, 2014.  (ECF Nos. 25 ¶ 6; 30 ¶ 6.)

In her capacity as a traffic-control person, Plaintiff primarily worked with Mr. Stamm's crew but also assisted other crews at times.  (ECF Nos. 25 ¶ 65; 30 ¶ 65.)  Mr. Stamm yelled when he was angry, and he used profanity and other foul language while on the job.  (ECF Nos.

25 ¶ 111; 30 ¶¶ 111, 352; 33 ¶¶ 111, 352.)  Plaintiff alleges, in part, that Mr. Stamm would use words such as "b--ch" and "c--t" directed at her, that he once pulled his pants down and mooned her in 2010 or 2011, that he yelled at her to "get in the f--ing truck," and that, after a paint can was knocked over, said that "this is where the f--ing paint goes and if you do this again[,] you will be the first f--ing [flagger] that [Defendant] had."  (ECF Nos. 25 ¶ 66; 30 ¶ 66; 33 ¶ 66.)

In 2011, Plaintiff and two of her co-workers shared their concerns regarding Mr. Stamm, including the mooning incident, with Billie Dick and Bob Flood, Sr., two of Defendant's employees.  (See ECF Nos. 25 ¶¶ 68, 70-72; 30 ¶¶ 68, 70-72, 375; 33 ¶ 375.)  In response, Mr. Flood advised Plaintiff to sign a Check of Facilities form to indicate that she had a complaint. (ECF Nos. 25 ¶ 72; 30 ¶ 72.)  Plaintiff contends that she told Mr. Flood that she would not sign the form because Mr. Stamm was the individual who had given her the form, and she feared retaliation.  (ECF Nos. 25 ¶ 73; 30 ¶ 73.)  Plaintiff alleges, in part, that a few days later, Mr. Stamm screamed profanities at her, told her to "keep her f--ing mouth shut," and told her that she could not go to the office because "that's how people lose their job."  (See ECF Nos. 25 ¶ 75; 30 ¶¶ 75, 378-379; 33 ¶¶ 75, 378-379.)  During the 2012 season, Mr. Stamm yelled at Plaintiff to "[t]ake off your f--ing glasses so you can see!"  (ECF Nos. 30 ¶ 368; 33 ¶ 368.)

On May 21, 2013, Employee Relations Manager Corey Reffner received a complaint from William Hutchinson, in which he complained that he was not called back to work, when Mr. Stamm had called other employees back to work, and stated that Mr. Stamm had previously yelled at him and said, "If you want to play games, I will play games."  (ECF Nos. 25 ¶¶ 92, 330; 30 ¶¶ 92, 330.)  Mr. Stamm also called Mr. Hutchinson names, such as "r--d."  (ECF Nos. 25 ¶

3

113; 30 ¶ 113.)  Mr. Reffner designated the matter as an Avenues of Appeal complaint for which further investigation had been initiated and scheduled a meeting with Mr. Stamm, Jim Miller, and Rick Emerick to address the allegations.  (ECF Nos. 25 ¶ 331; 30 ¶ 331.)

On May 23, 2013, Plaintiff met with Mr. Mills to discuss Mr. Stamm.  (ECF Nos. 30 ¶ 385; 33 ¶ 385.)  At the end of the conversation, Mr. Mills stated that he would contact Mr. Stamm, discuss the matters, and get back in touch with Plaintiff.  (ECF Nos. 30 ¶ 386; 33 ¶ 386.)  Also on May 23, 2013, Mr. Reffner, Mr. Emerick, and Mr. Miller met with Mr. Stamm to investigate the assignment of work for crews that had been called for the season and to address the fears of retaliation expressed by two employees who were reporting complaints.  (ECF Nos. 25 ¶ 332; 30 ¶ 332.)  During the meeting, Mr. Reffner, Mr. Emerick, and Mr. Miller addressed retaliation with Mr. Stamm, advised him of the need for fair and equal treatment of all of Defendant's employees, and stated that retaliation is prohibited.  (ECF Nos. 25 ¶ 333; 30 ¶ 333.)  The investigation into the assignment and work hours in 2013 did not substantiate the complaints that were alleged.  (ECF Nos. 25 ¶ 334; 30 ¶ 334.)  Mr. Mills later left Plaintiff a voicemail and stated that he had spoken with Mr. Stamm about the matter.  (See ECF Nos. 25 ¶¶ 81-82; 30 ¶¶ 81-82; 33 ¶¶ 81-82.)  In his voicemail, Mr. Mills stated that Mr. Stamm did not realize that there was a problem and that he felt things would be okay going forward, "but you know how he is." (See ECF Nos. 25 ¶¶ 83-84; 30 ¶¶ 83-84, 387; 33 ¶¶ 83-84, 387.)

Thereafter, Mr. Stamm asked Plaintiff if she wanted to go to another crew, and she stated that that would be fine.  (See ECF Nos. 25 ¶ 76; 30 ¶¶ 76, 388; 33 ¶¶ 76, 388.)  Plaintiff alleges that she and Mr. Stamm then got into a truck together, and he squeezed her shoulder, asking if they were okay.  (See ECF Nos. 25 ¶ 77; 30 ¶¶ 77, 388; 33 ¶¶ 77, 388.)  According to

Plaintiff, Mr. Stamm's behavior calmed down after this incident but worsened after one or two weeks. (*See* ECF Nos. 25 ¶ 78; 30 ¶ 78; 33 ¶ 78.) In June or July 2013, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), complaining of a hostile work environment, disparate treatment, and a failure to promote. (ECF Nos. 30 ¶ 485; 33 ¶ 485.) Plaintiff later amended her complaint to add claims for wrongful termination and retaliation. (ECF Nos. 30 ¶ 486; 33 ¶ 486.)

On June 25, 2013, Plaintiff again contacted Mr. Mills regarding Mr. Stamm. (*See* ECF No. 25 ¶ 87; 30 ¶ 87; 33 ¶ 87.) Mr. Mills mentioned the option of moving Plaintiff to another crew run by Carl Stamm, which was operating in Bigler, Pennsylvania. (ECF Nos. 25 ¶ 88; 30 ¶ 88.) Mr. Mills told Plaintiff to remain in her truck until he arrived at the job site. (ECF Nos. 30 ¶ 391; 33 ¶ 391.) After an inordinate amount of time passed, Plaintiff called Mr. Mills again, at which point he told Plaintiff to return to her home and to take some time off from work. (ECF No. 30 ¶ 392; 33 ¶ 392.) Plaintiff also spoke with Mr. Miller about her complaints regarding Mr. Stamm; Mr. Miller stated that he would speak with Mr. Stamm and get back to her that day. (ECF Nos. 25 ¶ 91; 30 ¶ 91.) After speaking with Mr. Miller, Plaintiff contacted Mr. Reffner and left him a message in which she stated that she would like to speak with him. (ECF Nos. 25 ¶ 92; 30 ¶ 92.) By the end of the day on June 25, 2013, Plaintiff had spoken with Mr. Mills, Ms. Dick, Mr. Miller, and Mr. Reffner. (*See* ECF Nos. 25 ¶ 93; 30 ¶ 93.)

On June 26, 2013, Mr. Reffner returned Plaintiff's call, spoke with her about Mr. Stamm, and scheduled a meeting with Plaintiff for July 1, 2013. (*See* ECF Nos. 25 ¶ 94; 30 ¶ 94; 33 ¶ 94.) During the call, Plaintiff stated that she did not want to work with Carl Stamm's crew because she believed that he answered to Mr. Stamm. (ECF Nos. 30 ¶ 411; 33 ¶ 411.) Plaintiff and Mr.

Reffner agreed that, in the meantime, Plaintiff should not report to work. (ECF Nos. 30 ¶ 397; 33 ¶ 397.) On July 1, 2013, Plaintiff met with Mr. Reffner and Mr. Miller to further discuss her complaints about Mr. Stamm and then completed, at least in part, an Avenues of Appeal Initial Review Form. (*See* ECF Nos. 25 ¶ 96; 30 ¶ 96; 33 ¶ 96.)

After the meeting, Mr. Reffner spoke with Denise Speck, Tom Crain, Jr., Cheryl Davis, Brian Eyerly, Tom Crain, Sr., and Andrea Quick regarding the incidents identified by Plaintiff. (ECF Nos. 25 ¶ 143; 30 ¶ 143.) Mr. Reffner did not speak with Mr. Hutchinson or Carl Stamm. (ECF Nos. 30 ¶¶ 406-407; 33 ¶¶ 406-407.) Ms. Speck contacted Mr. Reffner and stated that the only person she heard swearing during the week of June 25, 2013, was Plaintiff, who told Ms. Speck, "You tell [Mr. Stamm] the f--ing truck is at the quarry and he can take the cell phone and shove it up his a--." (ECF Nos. 25 ¶ 146; 30 ¶ 146.) During his investigation, Mr. Reffner learned that Mr. Stamm screamed at Ms. Quick, a female who was more senior than Plaintiff, and called her names, such as a "f--ing ret--d." (ECF Nos. 25 ¶¶ 115, 117; 30 ¶¶ 115, 117.)

When Mr. Reffner contacted Mr. Stamm, he was angry and stated that he would not participate in a meeting. (ECF Nos. 25 ¶¶ 147-148; 30 ¶¶ 147-148.) When Mr. Reffner and Mr. Stamm spoke on the telephone on July 3, 2013, Mr. Stamm stated that he was "not going to play with [Plaintiff's] p--y and make her happy like Charlie Taylor did." (ECF Nos. 25 ¶¶ 149, 151; 30 ¶¶ 149, 151, 399-400; 33 ¶¶ 399-400.) Mr. Stamm also stated that "you guys hire these women and tell them to call you if they have a problem[,] and I'm tired of it. Whatever she said it [sic] what its [sic] going to be." (ECF Nos. 25 ¶ 150; 30 ¶ 150, 399-400; 33 ¶¶ 399-400.) Following their telephone conversation, Mr. Reffner told Mr. Stamm that he was required to

participate in a meeting regarding Plaintiff's allegations and stated that he would prepare termination documents if Mr. Stamm did not report. (ECF Nos. 25 ¶ 155; 30 ¶ 155.)

Mr. Stamm participated in a meeting with Mr. Reffner on July 9, 2013. (*See* ECF Nos. 25 ¶ 156; 30 ¶ 156; 33 ¶ 156.) During the meeting, Mr. Stamm stated, in part, that he could perform his job without swearing and that he could continue to work with Plaintiff. (*See* ECF Nos. 25 ¶ 157; 30 ¶ 157; 33 ¶ 157.) Defendant and Mr. Stamm entered into a Last Chance Agreement on July 9, 2013. (ECF Nos. 25 ¶ 160; 30 ¶ 160.) Mr. Stamm was permitted to return to work and was not suspended for any period of time. (ECF Nos. 25 ¶ 162; 30 ¶ 162.) The same day, Mr. Reffner contacted Plaintiff and stated that the investigation did not substantiate the use of derogatory terms related to her sex but that he had issued appropriate discipline regarding the tone and profanity of Mr. Stamm's language. (*See* ECF Nos. 25 ¶¶ 164-165; 30 ¶¶ 164-165.)

On the following business day, July 12, 2013, Plaintiff informed Mr. Reffner that she heard the people with whom he had spoken lied and stated that she did not believe that she could work for Mr. Stamm but that she would like to work for Defendant in a location that was closer to her home. (*See* ECF Nos. 25 ¶¶ 166-167; 30 ¶¶ 166-167, 414; 33 ¶¶ 166-167, 414.) Mr. Reffner did not further investigate Plaintiff's contention that witnesses had lied to him and advised Plaintiff that he was unsure whether he could honor her reassignment request. (ECF Nos. 25 ¶ 168; 30 ¶¶ 168, 415; 33 ¶ 415.) Mr. Reffner followed up on Plaintiff's request with Mr. Emerick, stating that Plaintiff requested to be assigned elsewhere and that he advised her that Defendant prefers to have confidence that the measures taken are severe enough to avoid any further incidents. (ECF Nos. 25 ¶ 170; 30 ¶ 170.) As of July 16, 2013, Mr. Reffner had addressed Plaintiff's requests with Mr. Emerick, but they had not reached a decision on whether to

accommodate her. (ECF Nos. 25 ¶ 171; 30 ¶ 171.) When Mr. Reffner returned from a vacation on July 22, 2013, he found that Plaintiff's counsel had sent him a letter requesting that Plaintiff be reassigned away from Mr. Stamm in a location that would not be so far away that she would be unable to travel to her work location. (ECF Nos. 25 ¶¶ 172-173; 30 ¶¶ 172-173.) A resolution was reached on or around July 29, 2013, and Plaintiff returned to work on August 5, 2013, with Larry Shields's crew at a site in DuBois, which was not a significant distance away from her home. (ECF Nos. 25 ¶¶ 175, 177; 30 ¶¶ 175, 177.) Plaintiff received the same rate of pay as a laborer following her reassignment to Mr. Shields's crew. (ECF Nos. 25 ¶ 181; 30 ¶ 181.) She has not had any contact with Mr. Stamm since June 25, 2013. (ECF Nos. 25 ¶ 176; 30 ¶ 176.)

On October 3, 2013, after Mr. Stamm drove through Plaintiff's job site, Plaintiff advised Mr. Reffner that as long as someone informed her when Mr. Stamm would be on the site, "it would be fine," and she wanted to know why he was there so she did not feel uneasy. (*See* ECF Nos. 25 ¶¶ 185-186; 30 ¶¶ 185-186; 33 ¶¶ 185-186.) Plaintiff told Mr. Reffner that the conditions on the crew were otherwise generally favorable. (ECF Nos. 25 ¶ 187; 30 ¶ 187.) Following the conversation, Mr. Reffner spoke with Mr. Miller, who confirmed that Mr. Stamm would be completed with the project. (ECF Nos. 25 ¶ 188; 30 ¶ 188.) When Mr. Reffner advised Plaintiff that Carl Stamm would need to come through to pave the project, she stated that she had not had a problem with Carl Stamm. (ECF Nos. 25 ¶ 189; 30 ¶ 189.) Mr. Reffner informed Mr. Miller that he would need to be notified at any point in which Mr. Stamm would be near Plaintiff's job site so that he could notify Plaintiff. (ECF Nos. 25 ¶ 190; 30 ¶ 190.) On October 4, 2013, Plaintiff left a message for Mr. Reffner, stating that Mr. Shields told her that Mr. Stamm would work at the job site on October 4, 2013. (ECF Nos. 25 ¶ 191; 30 ¶ 191.) Mr. Reffner

contacted Mr. Miller, who stated that Mr. Shields was incorrect, and Mr. Reffner notified Plaintiff that Mr. Stamm would not be coming to the job site. (ECF Nos. 25 ¶ 191; 30 ¶ 191.)

On or around October 13, 2013, after receiving an anonymous letter, Mr. Reffner began an investigation regarding Mr. Stamm's behavior and learned through Mark Buynak and Joe Harzinski that Mr. Stamm was swearing and screaming at them on the job. (*See* ECF Nos. 25 ¶¶ 193-194; 30 ¶¶ 193-194; 33 ¶ 193.) As a result of his investigation, Mr. Reffner determined that Mr. Stamm needed to be terminated because he had violated the Last Chance Agreement, which was issued on July 9, 2013, for a period of twenty-four months, by using profanity on the job. (ECF Nos. 25 ¶195; 30 ¶ 195.) On October 24, 2013, Mr. Reffner contacted Plaintiff, advising her that Mr. Stamm had been terminated and inquiring whether she had any other issues that needed to be addressed. (ECF Nos. 25 ¶ 196; 30 ¶ 196.) In November 2013, Plaintiff was sent home for the 2013 season, which was significantly later than any season during which Plaintiff served on Mr. Stamm's crew. (ECF Nos. 30 ¶ 421; 33 ¶ 421.)

During the 2014 season, Plaintiff's first day of work was on April 28, 2014. (ECF Nos. 25 ¶ 206; 30 ¶ 206.) In May 2014, Plaintiff spoke with Chelsea Ankney, Defendant's employee who was responsible for assigning flagging work, regarding any flagging opportunities that were available. (ECF Nos. 25 ¶ 208; 30 ¶ 208.) When Plaintiff spoke with Ms. Ankney about a job in Hustontown, Ms. Ankney stated it the job would continue for approximately two weeks, or eight to ten working days. (ECF Nos. 25 ¶ 210; 30 ¶ 210.) Plaintiff worked in Hustontown for thirteen days, on May 6, 7, 8, 9, 12, 13, 14, 15, 16, 19, 20, 21, and 22 in 2014. (ECF Nos. 25 ¶ 211; 30 ¶ 211.) Ms. Quick, who was also working at the job in Hustontown, occasionally rode with Plaintiff to the job site. (ECF Nos. 25 ¶ 212; 30 ¶ 212.)

While working in Hustontown, Plaintiff learned that younger, less experienced male laborers were working in Clearfield County, near Plaintiff's home.  (ECF Nos. 30 ¶ 430; 33 ¶ 430.)  Plaintiff contacted Assistant General Manager Jeff Hileman to express her concern regarding the amount of time that it took her to drive to Hustontown and to report that she had heard that Mr. Eyerly and Mr. Crain, who were less senior than her, were working closer to her home.  (ECF Nos. 25 ¶ 214; 30 ¶ 214.)  Mr. Hileman contacted Ms. Ankney, stated that Plaintiff had complaints about her assignment, and made arrangements for Plaintiff to be reassigned to work closer to her home beginning on or around May 28, 2014.  (ECF Nos. 25 ¶ 218; 30 ¶ 218.)  Within one week of contacting Mr. Hileman, Plaintiff was assigned to work at a location closer to her home.  (ECF Nos. 25 ¶ 219; 30 ¶ 219.)  The new assignment was for a project occurring in Snyder Township and consisted of two days of work on May 15 and 19 in 2014.  (ECF Nos. 25 ¶ 220; 30 ¶ 220.)

While Plaintiff worked on the project in Hustontown, from May 6, 2014, through May 22, 2014, Plaintiff worked a total of 131 hours, including 11.5 hours of overtime.  (ECF Nos. 25 ¶ 221; 30 ¶ 221.)  During this time, Plaintiff's average hourly pay rate for the project in Hustontown was $24.846.  (ECF Nos. 25 ¶ 222; 30 ¶ 222.)  While Plaintiff was assigned to the job in Hustontown, Mr. Eyerly and Mr. Crain worked for a total of four days on a project in Bedford, on May 8, 9, 12, and 13 in 2014, and then worked for a total of two days, on May 19 and 20 in 2014, on a project in the Bigler area.  (ECF Nos. 25 ¶¶ 223-224; 30 ¶¶ 223-224.)  The project in the Bigler area was not "rated," meaning that it did not pay prevailing wage rates.  (ECF Nos. 25 ¶ 225; 30 ¶ 225.)  During the time that Plaintiff was assigned to Hustontown, Mr. Eyerly worked a total of 50.5 hours, received no overtime, and had an average hourly pay rate

of $22.324; Mr. Crain worked a total of 59 hours, received no overtime, and had an average hourly rate of $22.198.  (ECF Nos. 25 ¶¶ 226-227; 30 ¶¶ 226-227.)  During the month of May 2014, Plaintiff worked 153 hours, including 11.5 hours of overtime, and had an average hourly pay of $24.601.  (ECF Nos. 25 ¶ 228; 30 ¶ 228.)  During the month of May 2014, Mr. Eyerly worked 81.5 hours, received no overtime, and had an average hourly pay rate of $21.373; Mr. Crain worked 90 hours, received no overtime, and had an average hourly rate of $20.862.  (ECF Nos. 25 ¶¶ 229-230; 30 ¶¶ 229-230.)  Over the final years of Plaintiff's employment, specifically from 2010 through 2014, she made progressively less money each year.  (ECF Nos. 30 ¶ 459; 33 ¶ 459.)

On May 28, 2014, Plaintiff was assigned to a project in the Lawrence Township/Clearfield area, which was closer to her home.  (ECF Nos. 25 ¶ 231; 30 ¶ 231.)  Carl Stamm oversaw the job, and his crew included some of the members with whom Plaintiff had worked on Mr. Stamm's crew.  (ECF Nos. 25 ¶ 232; 30 ¶ 232.)  On May 28, 2014, Bob McClure handed Plaintiff a document entitled the "Hurt Feelings Report," which was a form that referred to employees making complaints.  (See ECF Nos. 25 ¶¶ 233-235, 259; 30 ¶¶ 233-235, 259.)  The Hurt Feelings Report asked for the "[r]easons for filing this report" and listed reasons such as, "I am thin skinned;" "I am a p--y;" "I have women[-]like hormones;" "I am a qu--r;" "I am a little b--h;" "I am a crybaby;" "I want my mommy;" and "ALL OF THE ABOVE."  (ECF Nos. 30 ¶ 435; 33 ¶ 435.)  Plaintiff continued to work a nine-hour day on May 28, 2014, reported for work on May 29, 2014, but was sent home along with the rest of the crew due to rain, and reported for work on May 30, 2014.  (See ECF Nos. 25 ¶ 259; 30 ¶ 259.)  On May 30, 2014, Carl Stamm asked Plaintiff to sign a Check of Facilities form, but she stated that she could not and

advised him that Mr. McClure had given her the Hurt Feelings Report. (ECF Nos. 25 ¶ 235; 30 ¶ 235.) Carl Stamm contacted Mr. Flood, who came to the job site to speak with Plaintiff on May 30, 2014. (ECF No. 25 ¶ 236; 30 ¶ 236.) Plaintiff stated that she did not want Mr. McClure to lose his job but stated that she wanted to be able to do her job. (ECF No. 25 ¶ 238; 30 ¶ 238.)

On May 30, 2014, Greg Brunnhuber, who had replaced Mr. Reffner on April 21, 2014, after Mr. Reffner resigned in December 2013 to pursue other employment, was advised of the Hurt Feelings Report. (ECF Nos. 25 ¶¶ 240-242; 30 ¶¶ 240-242.) That day, Mr. Brunnhuber discussed the incident with Plaintiff, Carl Stamm, Mr. Flood, and Mr. McClure. (ECF Nos. 25 ¶ 242; 30 ¶ 242.) On June 2, 2014, Mr. Brunnhuber conducted interviews on the job site with Plaintiff, Mr. McClure, Neal Becker, and Ms. Quick. (ECF Nos. 25 ¶ 243; 30 ¶ 243.) Mr. Becker and Mr. McClure admitted to giving Plaintiff the Hurt Feelings Report. (ECF Nos. 30 ¶ 442; 33 ¶ 442.) While speaking with Mr. Brunnhuber, Plaintiff complained about her previous assignment in Hustontown, claiming that she had heard that less senior men were being paid at a laborer rate in an area closer to her home and stating that she wanted to be on her old crew. (ECF Nos. 25 ¶ 246; 30 ¶ 246.)

After Mr. Brunnhuber interviewed other individuals on June 2, 2014, he spoke with Plaintiff again, at which time she admitted to raising her middle finger and gesturing toward Mr. McClure on the job site in the prior year; Plaintiff agreed with Mr. Brunnhuber that such conduct was not professional or appropriate for the workplace. (ECF Nos. 25 ¶ 255; 30 ¶ 255.) Mr. Brunnhuber advised Plaintiff that he had spoken with other individuals, including Mr. McClure and Mr. Becker, stated that he would get back to her on the matter, and informed Plaintiff that he would look into the matter of the assignment of laborer versus flagging work.

(ECF Nos. 25 ¶ 256; 30 ¶ 256.)   Plaintiff's understanding was that Mr. Brunnhuber was investigating the complaint.  (ECF Nos. 25 ¶ 257; 30 ¶ 257.)

Plaintiff continued to report to the same job site every day that work was available from June 2 through June 16, 2014, with the exception of one Sunday that she missed due to having water problems at her home.  (ECF Nos. 25 ¶ 260; 30 ¶ 260.)  Unbeknownst to Plaintiff at the time, Mr. Brunnhuber was released from his employment on June 6, 2014.  (ECF Nos. 30 ¶ 445; 33 ¶ 445.)  Plaintiff decided to resign from her position on the morning of June 17, 2014, approximately two weeks after Mr. Brunnhuber had visited the site to investigate.  (ECF Nos. 25 ¶¶ 264, 266; 30 ¶¶ 264, 266.)  Plaintiff resigned, in part, because she did not believe that Defendant would protect her from retaliation and because, as far as she was concerned, Defendant did not discipline any of the people involved in the Mr. Stamm and Mr. McClure cases.  (*See* ECF Nos. 25 ¶ 265; 30 ¶ 265.)  Plaintiff testified that she contacted human resources, told a woman that she wanted to terminate her employment with Defendant, and was connected to a man named Jake, who did not answer his telephone.  (ECF Nos. 25 ¶ 270; 30 ¶ 270.)  After Plaintiff called the corporate office, which sent her back to the same person, she left a voicemail regarding her resignation.  (ECF Nos. 25 ¶ 270; 30 ¶ 270.)  Plaintiff received a telephone call from Jake Gathers regarding her resignation but declined his invitation to complete an exit interview.  (*See* ECF Nos. 25 ¶¶ 272-273, 276; 30 ¶¶ 272-273, 276.)  Mr. Gathers and Mr. Emerick, in the absence of Mr. Brunnhuber, continued to investigate by e-mailing Mr. Hileman and Jeff Miller on June 19 and 20 of 2014, and these messages were forwarded to Mr. Reffner when he returned to work for Defendant as the Human Resources Manager.  (ECF Nos.

25 ¶ 277; 30 ¶ 277.)  On June 27, 2014, the EEOC provided a Notice of Right to Sue in relation to Plaintiff's original filing.  (ECF Nos. 30 ¶ 487; 33 ¶ 487.)

Plaintiff filed a complaint against Defendant on June 30, 2014.  (ECF No. 1.)  Plaintiff then filed an amended complaint on July 2, 2014, alleging claims of a hostile work environment, constructive discharge, wrongful failure to promote, and retaliation.  (ECF No. 2.)  Defendant filed an answer to Plaintiff's amended complaint on July 18, 2014.  (ECF No. 5.)  Following the close of discovery, Defendant filed the present motion for summary judgment on July 31, 2015. (ECF No. 24.)  Plaintiff filed a response in opposition on September 17, 2015.  (ECF No. 29.)  The matter has been fully briefed (ECF Nos. 25, 26, 30, 33, 34), and is ripe for disposition.

## IV.     Standard of Review

A grant of summary judgment is appropriate when the moving party establishes that "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)).  A genuine issue of material fact is one that could affect the outcome of litigation. *Mahoney v. McDonnell*, 616 Fed. Appx. 500, 504 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).  However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'"  *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues.  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine

issue, in rebuttal. *Id.* (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Connection Training Servs. v. City of Philadelphia*, 358 Fed. Appx. 315, 318 (3d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 324).

## V. Discussion

### A. Defendant's Motions to Strike Plaintiff's and Monica Graham's Affidavits

#### 1. Plaintiff's Affidavit

Because Defendant contends that Plaintiff has submitted two sham affidavits in an attempt to create genuine issues of material fact, the Court will first address Defendant's motions to strike Plaintiff's and Monica Graham's Affidavits. Regarding Plaintiff's affidavit, Defendant argues that paragraphs 30, 38, 39, 69, 70, 71, 92, 93, 95, and 97 must be stricken. (ECF No. 35.) Specifically, Defendant asserts that these portions of Plaintiff's affidavit are in direct contradiction to Plaintiff's previous testimony at her unemployment compensation hearing and

at her deposition because they contain new material assertions that Plaintiff omitted from her prior testimony. (ECF No. 36 at 19.) In response, Plaintiff argues that her affidavit does not contradict her previous testimony and that she had no affirmative duty to raise facts in her own deposition. (ECF No. 40.)

Under the sham affidavit doctrine, "a court will disregard an affidavit that is inconsistent with an affiant's prior deposition testimony . . . unless the party relying on the affidavit in opposition to the motion can present a legitimate reason for the discrepancies between the deposition and the affidavit." *Smith v. Johnson and Johnson*, 593 F.3d 280, 285 n.3 (3d Cir. 2010); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.") (internal quotations omitted).

The Third Circuit has adopted a "flexible approach" in applying the sham affidavit analysis. *Jiminez*, 503 F.3d at 254. Specifically, if independent evidence in the record bolsters an otherwise questionable affidavit, courts within the Third Circuit will generally not disregard the affidavit. *Id.* (citing *Baer v. Chase*, 392 F.3d 609, 624-25 (3d Cir. 2004)). The corroborating evidence may establish that the affiant was mistaken, confused, or did not possess all of the facts during the previous deposition. *Id.* However, "[w]hen a party does not explain the

contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." *Id.*

Defendant first argues that paragraphs 70 and 71 of Plaintiff's affidavit must be stricken because they contradict Plaintiff's prior testimony.  (ECF No. 36 at 3-7.)  In paragraphs 70 and 71 of her affidavit, Plaintiff states that in 2011, Ms. Dick called her several days after she revealed that Mr. Stamm had told her to "[g]et in the truck, b--h," to ask whether Mr. Stamm's behavior had improved.  (ECF No. 30-8 at 12.)  Plaintiff states that she told Ms. Dick that Mr. Stamm said that he would treat Plaintiff however he wanted and that she would lose her job if she continued to report him.  (*Id.*)  Defendant asserts that Plaintiff's statement contradicts her previous testimony in which she stated that she did not report Mr. Stamm's behavior until May 2013.  (ECF No. 36 at 4-5.)

In response, Plaintiff clarifies that she testified that she first reported Mr. Stamm's behavior to "the HR department" in 2013 and that, to her knowledge, Ms. Dick was a managerial employee who did not work in the central human resources department.  (ECF No. 40 at 5-6.)  Plaintiff further notes that Ms. Dick initiated the telephone call to her, meaning that Plaintiff did not "go to" Ms. Dick to report Mr. Stamm's behavior in 2011.  (*Id.* at 7.)  Finally, Plaintiff states that Defendant's counsel did not ask her whether Ms. Dick followed up with her and instead asked whether she contacted anyone from the human resources department.  (*Id.* at 8.)  Plaintiff contends that the answer to Defendant's counsel's question, during the relevant timeframe of 2011, remains no.  (*Id.*)  Having reviewed Plaintiff's testimony, the Court finds that

the independent evidence in the record bolsters paragraphs 70 and 71 of Plaintiff's affidavit and that Plaintiff's statements do not have the qualities of patently sham averments. *Jiminez*, 503 F.3d at 254; *see also Heasley v. Echostar Satellite L.L.C.*, No. 08-CV-261, 2009 U.S. Dist. LEXIS 45035, at *3 (W.D. Pa. May 22, 2009) (finding that the issues that the defendant raised "are more properly characterized as gaps or minor discrepancies in [the plaintiff's] testimony, which bear on her credibility and are matters properly reserved for cross-examination" and which "are immaterial to the disposition of [the defendant's] Motion [for summary judgment]"). Moreover, the Court notes that the parties have agreed that in 2011, Plaintiff and two of her co-workers shared their concerns regarding Mr. Stamm, including the mooning incident, with Ms. Dick and Mr. Flood, Sr., two of Defendant's employees. (*See* ECF Nos. 25 ¶¶ 68, 70-72; 30 ¶¶ 68, 70-72, 375; 33 ¶ 375.) The Court will therefore deny Defendant's request to strike paragraphs 70 and 71 of Plaintiff's affidavit.

Defendant next argues that paragraph 95 of Plaintiff's affidavit must be stricken because it contradicts Plaintiff's prior testimony. (ECF No. 36 at 7-9.) In paragraph 95, Plaintiff states that Mr. McClure and Mr. Becker increased their use of derogatory language, including the word "b--h," after she received the Hurt Feelings Report. (ECF No. 30-8 at 16.) Defendant asserts that Plaintiff specifically testified that Mr. McClure did not call her any names and made no mention of any name calling or harassing conduct from Mr. Becker. (ECF No. 36 at 8.)

In response, Plaintiff states that she "stands by her initial statement that Mr. McClure did not call her names during that period of time." (ECF No. 40 at 9.) She states that "the affidavit needs to be clarified" because "it was Mr. Becker and other coworkers who called [her] names during that period of time — Mr. McClure only engaged in non-verbal harassment."

(*Id.*)  In light of Plaintiff's clarification, the Court will strike the portion of paragraph 95 that includes Mr. McClure.  The Court rejects Defendant's argument that Plaintiff made no mention of Mr. Becker's conduct because Defendant's counsel's questioning referred only to Mr. McClure.  (*See* ECF No. 36 at 8.)  Plaintiff therefore did not have an opportunity to testify regarding Mr. Becker's conduct.  Accordingly, paragraph 95 will be stricken in part to read, "Additionally, my coworkers, primarily Mr. Becker, increased their use of derogatory language, like 'b--h,' as did their mimicking of Andrea Quick and me."

Defendant argues that paragraphs 92, 93, and 97 of Plaintiff's affidavit must be stricken because they contradict Plaintiff's prior testimony.  (ECF No. 36 at 9-15.)  In paragraphs 92, 93, and 97, Plaintiff states that in the weeks following May 30, 2014, she repeatedly called Mr. Brunnhuber's cell phone number, that she called Defendant's human resources department at least three times to speak to Mr. Brunnhuber, and that no one told her that Mr. Brunnhuber was no longer working for Defendant.  (ECF No. 30-8 at 15-16.)  Defendant states that Plaintiff testified that she did not contact Defendant's human resources office until she called to resign on June 17, 2014.  (ECF No. 36 at 10.)

In response, Plaintiff states that Defendant's counsel asked her whether she called Mr. Brunnhuber's cell phone, to which Plaintiff responded affirmatively.  (ECF No. 40 at 10.) Plaintiff notes that Defendant's counsel did not ask her how many times she called Mr. Brunnhuber's cell phone.  (*Id.*)  Plaintiff argues that Defendant cites to her testimony in which she was asked whether she spoke "to anybody . . . [a]bout the situation with Bob McClure," to which Plaintiff responded negatively.  (*Id.* at 11.)  Plaintiff asserts that her testimony does not contradict her affidavit because she called and asked to speak to Mr. Brunnhuber; she did not

speak to anyone about Mr. McClure. (*Id.*) Having reviewed Plaintiff's testimony, the Court finds that the independent evidence in the record bolsters Plaintiff's averments and that Plaintiff's statements do not have the qualities of patently sham averments. *Jiminez*, 503 F.3d at 254; *see also Heasley*, 2009 U.S. Dist. LEXIS 45035, at *3. The Court further notes that the parties have agreed to the allegations contained in paragraph 97 of Plaintiff's affidavit because they have agreed that unbeknownst to Plaintiff at the time, Mr. Brunnhuber was released from his employment on June 6, 2014. (ECF Nos. 30 ¶ 445; 33 ¶ 445.) The Court will therefore deny Defendant's request to strike paragraphs 92, 93, and 97 of Plaintiff's affidavit.

Defendant next argues that paragraph 30 of Plaintiff's affidavit must be stricken because it contradicts Plaintiff's admission to Mr. Reffner and Mr. Miller. (ECF No. 36 at 15.) In paragraph 30, Plaintiff states that Mr. Stamm did not subject the male employees on the crew to his inappropriate behaviors. (ECF No. 30-8 at 5.) Defendant contends that Plaintiff told Mr. Reffner and Mr. Miller that Mr. Stamm "is not prejudiced, he is like this with everyone, even inspectors." (ECF No. 36 at 15 (internal quotations omitted).)

In response, Plaintiff states that Defendant relies upon Mr. Reffner's notes of a conversation from July 2013 and that Plaintiff disputes Mr. Reffner's notes. Because Mr. Reffner's notes are not a prior sworn statement and because paragraph 30 does not have the qualities of a patently sham averment, the Court will deny Defendant's request to strike paragraph 30. *Baer*, 392 F.3d at 624 ("The 'sham affidavit' doctrine refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts *the affiant's* prior deposition testimony.") (emphasis added); *see also Heasley*, 2009 U.S. Dist. LEXIS 45035, at *3.

Defendant argues that paragraphs 39 and 69 of Plaintiff's affidavit must be stricken because Plaintiff failed to raise these material facts in her prior testimony. (ECF No. 36 at 16-18.) In paragraph 39, Plaintiff states that Mr. Stamm progressively worsened his behavior toward her, called her a "c--t" on a regular basis, and touched her inappropriately by placing his hands on her back side. (ECF No. 30-8 at 6.) In paragraph 69, Plaintiff states that she told Ms. Dick and Mr. Flood that Mr. Stamm told her to "[g]et in the truck, b--h," made comments about having a relationship with her, and, on multiple occasions, inappropriately touched her back side. (*Id.* at 11.) Defendant contends that Plaintiff never referenced Mr. Stamm touching her back side at the unemployment compensation hearing or at her deposition. (ECF No. 36 at 16.) Defendant also states Plaintiff did not make a report of sexual harassment to Ms. Dick and Mr. Flood in 2011. (*Id.* at 16-17.)

In response, Plaintiff states that she "cannot rattle off every possible harassment incident on a moment's notice." (ECF No. 40 at 13.) Plaintiff notes that Defendant's counsel asked her, "You indicated that there was actual physical contact," at the unemployment compensation hearing. (*Id.*) Defendant's counsel did not ask Plaintiff to chronicle her experiences or to provide the various forms of physical contact that she encountered. (*Id.* at 13-14.) Having reviewed Plaintiff's testimony, the Court finds that the independent evidence in the record bolsters Plaintiff's averments and that Plaintiff's statements do not have the qualities of patently sham averments. *Jiminez*, 503 F.3d at 254; *see also Heasley*, 2009 U.S. Dist. LEXIS 45035, at *3. Moreover, the Court notes that Defendant's argument that Plaintiff did not report Mr. Stamm's behavior to Ms. Dick and Mr. Flood is meritless. The parties have agreed that in 2011, Plaintiff and two of her co-workers shared their concerns regarding Mr. Stamm, including the mooning

incident, with Ms. Dick and Mr. Flood, Sr., two of Defendant's employees.  (*See* ECF Nos. 25 ¶¶ 68, 70-72; 30 ¶¶ 68, 70-72, 375; 33 ¶ 375.)  The Court will therefore deny Defendant's request to strike paragraphs 39 and 69 of Plaintiff's affidavit.

Finally, Defendant argues that paragraph 38 of Plaintiff's affidavit must be stricken because Plaintiff failed to raise this material fact in her prior testimony.  (ECF No. 36 at 18-19.) In paragraph 38, Plaintiff states that she attempted to return to work with Mr. Stamm after she spoke with Mr. Mills but that Mr. Stamm threatened her after he had a conversation with Mr. Mills.  (ECF No. 30-8 at 6.)

In response, Plaintiff argues that she did not have an obligation to volunteer information during her deposition.  (ECF No. 40 at 15-16.)  This Court has previously rejected the argument that a plaintiff must raise issues that are included in an affidavit because "[it] does not read *Jimenez* to preclude consideration of a plaintiff's affidavit merely because the plaintiff was questioned in some respect by her own counsel at the time of her deposition."  *Steward v. Altoona First Savs. Bank*, No. 3:12-CV-203, 2014 U.S. Dist. LEXIS 124908, at *23 n.6 (W.D. Pa. Sept. 8, 2014).  The Court will therefore deny Defendant's request to strike paragraph 38 of Plaintiff's affidavit.

Accordingly, Defendant's motion to strike Plaintiff's affidavit will be granted to the extent that paragraph 95 will be stricken in part to read, "Additionally, my coworkers, primarily Mr. Becker, increased their use of derogatory language, like "b--h," as did their mimicking of Andrea Quick and me."  Defendant's remaining requests in its motion to strike will be denied.

## 2. Monica Graham's Affidavit

Regarding Ms. Graham's affidavit, Defendant argues that Ms. Graham's affidavit must be stricken in its entirety because it is "me too" evidence that is irrelevant and because it states conclusory allegations that lack specific facts and contain inadmissible hearsay. (ECF No. 38 at 3-10.) In response, Plaintiff argues that Ms. Graham's affidavit should not be stricken because it details the conduct of some individuals with whom Plaintiff worked. (ECF No. 39 at 4-7.) Plaintiff also asserts that Ms. Graham's affidavit provides direct evidence of Defendant's knowledge of discrimination complaints that is based upon Ms. Graham's personal knowledge. (Id. at 7-15.)

In her affidavit, Ms. Graham states that she worked as a part-time traffic flagger for Defendant from March 2008 until August 2010, at which time she transferred to a full-time laborer. (ECF No. 30-15 at 1.) Ms. Graham received "resistance" from her supervisor, Joseph Harzinski, and her male co-workers. (Id. at 1-2.) Her co-workers called her a "r--d," asked her if she had "slept with somebody" to obtain her position, and told her that "a woman was the last thing [they] needed," "girls weren't meant to be here," and male employees "need[ed] to get the job done." (Id. at 2.) Mr. Harzinski and Ms. Graham's co-workers referred to Ms. Graham as "woman," "b--h," and "c--t," Mr. Harzinski verbally and physically abused her, and Mr. Flood asked about her preferred sexual positions. (Id. at 3.) Mr. Harzinski and Mr. Flood required Ms. Graham to complete menial tasks to entertain her male co-workers. (Id. at 4.) Ms. Graham states that Defendant did not address or correct these behaviors after she complained to her supervisors. (Id.) Mr. Flood told Ms. Graham not to complain "to the office" because it would be "a big mistake." (Id. at 5.) When Ms. Graham provided Defendant's representatives

with the complete chronology of her harassment, including the names of four individuals who harassed her on an ongoing basis, Defendant only took disciplinary action against one individual. (*Id.* at 6.) When a representative returned to meet Ms. Graham, he stated that he did not wish to address the issue again after Ms. Graham stated that the harassment was continuing. (*Id.* at 7.) Ms. Graham terminated her employment because Defendant would not address the harassment by her crew members. (*Id.* at 7-8.) Ms. Graham states that her failure to advance past a laborer job was unusual because male employees received additional advancements. (*Id.* at 8-9.)

The Third Circuit has explained that "'me too'" evidence in an employment discrimination case is neither *per se* admissible nor *per se* inadmissible. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Rather, "the question of whether evidence of discrimination against other employees by other supervisors is relevant is fact based and depends on several factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* The Third Circuit "'afford[s] broad discretion to a district court's evidentiary rulings.'" *Id.* at 167-68 (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008)).

Having reviewed Plaintiff's circumstances and theory of the case, the Court notes that Ms. Graham's allegations relate to Mr. Harzinski's and her unnamed co-workers' conduct. As Defendant has argued, these individuals are not related to the instant matter because Plaintiff's claims do not involve Mr. Harzinski or Ms. Graham's unnamed co-workers. However, as Plaintiff has noted, Mr. Stamm and Mr. Harzinski reported to Mr. Flood, and the factual circumstances of the case involve Mr. Flood. Additionally, some of the averments in Ms.

Graham's affidavit relate to Plaintiff's circumstances and claims, such as Ms. Graham's assertion that she was called profane names and that Defendant did not address the issue after she complained. The Court will therefore deny Defendant's motion to strike and will consider Ms. Graham's affidavit to the extent that the averments are related to the theory and circumstances of Plaintiff's case. *See, e.g.*, *Troy v. State Corr. Inst. - Pittsburgh*, No. 11-CV-1509, 2013 U.S. Dist. LEXIS 144647, at *16 (W.D. Pa. Aug. 14, 2013) (explaining that "me too" evidence "may be relevant to prove intent or to prove whether an employer knew or should have known about the harassment") (internal quotations and alterations omitted); *Kenawell v. Dubois Bus. College, Inc.*, No. 3:05-CV-429, 2008 U.S. Dist. LEXIS 26730, at *21-24 (W.D. Pa. Mar. 20, 2008) (considering affidavit prepared after the affiant met with an employee who reported an incident of sexual harassment).

### B.     Defendant's Motion for Summary Judgment

In its motion for summary judgment, Defendant asserts that it is entitled to judgment as a matter of law because Plaintiff has failed to make a prima facie showing of gender-based discrimination, a gender-based hostile work environment, constructive discharge, or retaliation. (ECF No. 26 at 14-96.) Defendant also argues that Plaintiff cannot recover punitive damages. (*Id.* at 96-97.)  In her Memorandum of Law in Opposition, Plaintiff argues that she adduced sufficient evidence to make out a prima facie case as to each of her claims, including her claim for punitive damages.  (ECF No. 29 at 15-81.)

1. **Hostile Work Environment**

   a. **Time Bar**

Defendant first argues that Plaintiff's allegations regarding incidents that occurred before October 2012 are barred because Plaintiff did not file a charge of discrimination with the EEOC until 2013.  (ECF No. 26 at 17-19.)  In response, Plaintiff asserts that the Court must consider all acts amounting to a hostile work environment, not only the conduct that falls within the limitations period.  (ECF No. 29 at 16-17.)

To bring suit in Pennsylvania under Title VII, a claimant must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice.  *See Mandel*, 706 F.3d at 165.  In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court addressed whether an act that falls outside the statute of limitations for filing an administrative charge can support a lawsuit under Title VII.  536 U.S. 108.  The Court held that the answer depends upon whether the plaintiff seeks recovery for a discrete discriminatory act or a hostile work environment.  *Id.* at 110.  Specifically, the Court explained that because a discrete discriminatory act is a separately actionable unlawful employment practice, a plaintiff seeking recovery for a discrete discriminatory act must file an administrative charge within the statute of limitations.  *Id.* at 113-14.  The Court further stated that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the [statute of limitations time period] after the discrete discriminatory act occurred."  *Id.* at 113.  However, a plaintiff may refer to prior acts that occurred outside the statute of limitations "as background evidence in support of a timely claim."  *Id.*; *see also McCann v. Astrue*, 293 Fed.

Appx. 848, 851 n.3 (3d Cir. 2008) (explaining that discrete discriminatory acts "may . . . be used as background evidence in support of timely claims").

In discussing hostile work environment claims, the Court explained that such claims exist "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Morgan*, 536 U.S. at 116 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). A hostile work environment "cannot be said to occur on any particular day." *Id.* Instead, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Thus, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117. Because a hostile work environment is a continuing violation, the Court concluded that it is only necessary that at least one act contributing to the claim falls within the statute of limitations period. *Id.* at 117-18.

The Third Circuit has interpreted the holding in *Morgan* as "a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006). Discrete acts "must be raised within the applicable limitations period or they will not support a lawsuit," while a hostile work environment claim "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Id.* The Third Circuit developed "the following non-exhaustive list of discrete acts for which the limitations period runs from the act:

termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." *Id.*

Plaintiff has testified that the frequency of Mr. Stamm's name calling was "[p]robably three times a week at least[,] sometimes more. Sometimes it could be a few times a day[,] just depending on the mood that he was in." (ECF No. 30-9 at 9.) Under the continuing violations doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotations omitted). The Third Circuit has set forth a two-part test to determine whether the continuing violation doctrine applies to a given case. *West v. Phila. Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995). First, the plaintiff "must demonstrate that at least one act occurred within the filing period." *Id.* Second, the plaintiff "must establish that the [alleged wrong] is more than the occurrence of isolated or sporadic acts." *Id.*

Here, Defendant does not dispute that at least one act occurred within the filing period. (*See* ECF No. 26 at 17-19.) As discussed above, Plaintiff testified that the frequency of Mr. Stamm's name calling was at least three times per week. Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff seeks recovery for a hostile work environment rather than for a discrete discriminatory act. Accordingly, because at least one act contributing to Plaintiff's claim fell within the statute of limitations period, the Court finds that Plaintiff's allegations regarding incidents that occurred before October 2012 are not time barred. *See, e.g.*, *Cowell*, 263 F.3d at 292 ("[W]hen a defendant's conduct is part of a continuing practice,

an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."); *Brown v. Joel Tanis & Sons, Inc.*, No. 2:13-CV-2984, 2014 U.S. Dist. LEXIS 80475, at *6 (D.N.J. June 12, 2014) (finding that the plaintiff's claim satisfied the statute of limitations because the defendants frequently subjected him to racial slurs).

### b. Prima Facie Case

Under Title VII, an employer cannot "'discharge . . . or . . . discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex.'" *Huston v. Proctor & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (quoting 42 U.S.C. § 2000e-2(a)(1)). Presently, Plaintiff claims that her allegations regarding discriminatory practices and actions at her place of employment created a hostile work environment, based on her gender, in violation of Title VII. In order for Plaintiff to make a prima facie showing of a hostile work environment, she must prove that "'(1) she suffered intentional discrimination because of her sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability.'" *Martinez v. Rapidigm, Inc.*, 290 Fed. Appx. 521, 524 (3d Cir. 2008) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (internal alterations omitted)). In its Motion for Summary Judgment, Defendant takes issue primarily with Plaintiff's ability to meet the first, second, fourth, and fifth prongs of the above test.

### i. Prong One

With respect to the first prong, it is well settled that "a plaintiff need not produce direct evidence of an actor's motivation for conduct that can be found to be discrimination." *Hegyes v.*

*United States Steel Corp.*, No. 2:04-CV-1283, 2007 U.S. Dist. LEXIS 5368, at \*20 (W.D. Pa. Jan. 25, 2007) (citing *Abramson v. William Paterson College*, 260 F.3d 265, 278 (3d Cir. 2001)).  Indeed, "it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind" because "a plaintiff is not 'required . . . to demonstrate direct proof that her harasser's intent was to create a discriminatory environment.'"  *Id.* (quoting *Abramson*, 260 F.3d at 277-78).  Instead, "'[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [sex]."  *Id.* at \*20-21 (quoting *Abramson*, 260 F.3d at 277).  The intent to discriminate "can be inferred from the entire context in question and the conduct of the actors involved."  *Id.* at \*21.  Accordingly, "[r]egardless of what a harasser's intention is," a hostile work environment claim will survive summary judgment "if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* (quoting *Abramson*, 260 F.3d at 278-79).  Stated another way, "'where . . . the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of her sex, the first prong of the prima facia [sic] case is met.'"  *Id.* (quoting *Abramson*, 260 F.3d at 279).

To satisfy the first prong, the proffered conduct or statements need not be explicitly sexual.  *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally

affect a female employee."); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (explaining that "overt . . . harassment [based upon race or sex] is not necessary to establish a hostile environment"). "All that is required is a showing that [sex] is a substantial factor in the harassment, and that if the plaintiff had been [a male] she would not have been treated in the same manner." *Aman*, 85 F.3d at 1083.

Here, Plaintiff alleges that Mr. Stamm used several profanities, including "a--," "b--h," "c--t," and variations of the word "f--k." The Third Circuit has stated that "b--h" may or may not be a derogatory term indicative of sex-based hostility. *Thomas v. Town of Hammonton*, 351 F.3d 108, 118 n.6 (3d Cir. 2003) (finding that, given the other evidence in the case, the use of the word was "one piece of evidence among many suggesting hostile work environment sexual harassment"). Case law within the Third Circuit "does not reflect uniform results with respect to whether 'bitch' does or does not constitute sexual harassment. However, it appears that where a plaintiff can articulate other instances of explicit sexual harassment, that word can reasonably be interpreted as *further* evidence of sexual harassment." *Davis v. SEPTA*, No. 13-CV-6864, 2016 U.S. Dist. LEXIS 2106, at *18 n.9 (E.D. Pa. Jan. 8, 2016) (emphasis in original) (citing *Ivan v. Cnty. of Middlesex*, 595 F. Supp. 2d 425, 455 (D.N.J. 2009) (noting that the term "house b--h" could be interpreted as contributing to a hostile work environment because the plaintiff's male supervisor used the term in conjunction with various other sexually explicit phrases), *and Mandel*, 706 F.3d at 167 (noting that the female plaintiff's male supervisor's repeated reference to the plaintiff as a "f--ing b--h," coupled with various other sexually explicit statements, could give rise to the inference that he used the term because of the plaintiff's gender)).

The Court in *Davis* further explained that "where . . . the word 'bitch' makes up [the] majority of the alleged misconduct, courts have concluded that this context more appropriately supports the inference that its use was merely an offensive epithet, and not based on sex." *Id.* (citing *Kidd v. Com. of Pennsylvania*, 37 F. App'x 588, 593 (3d Cir. 2002) (noting that a supervisor's one-time use of the word "b--h" during an argument with the plaintiff was not sexual harassment)); *see also Reyes v. McDonald Pontiac GMC Truck, Inc.*, 997 F. Supp. 614, 617 (D.N.J. 1998) ("Name calling and loud arguments do not constitute a sexual harassment claim. The fact that [a co-worker] referred to plaintiff on two occasions as a 'bitch' or 'Miss F**** Queen Bee' does not show that she was discriminated against because of her sex. Was [the co-worker] rude? Yes. Were [the co-worker's] comments inappropriate in an employment setting? Yes. But that is all they were. Sometimes words of frustration and anger are only meant in that spirit."); *Koschoff v. Henderson*, 109 F. Supp. 2d 332, 336 (E.D. Pa. 2000) (concluding that the use of the word "b--h" was not specifically motivated by the plaintiff's sex).

With respect to the word "c--t," some courts have found that use of the word is evidence of harassment based on gender. *See, e.g., Crooks v. Nat'l Oilwell Varco, L.P.*, No. 3:11-CV-1036, 2013 U.S. Dist. LEXIS 104651, at *19-20 (M.D. Pa. July 26, 2013); *King v. City of New Kensington*, No. 06-CV-1015, 2008 U.S. Dist. LEXIS 76485, at *9, 57 (W.D. Pa. Sept. 30, 2008) (finding that the words "c--t," "p--y patrol," and "b--h" were sexually explicit comments that were made about the plaintiff because she was a female); *Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 576 (D.N.J. 2005) (finding the first prong was satisfied because the plaintiff's supervisor "used

derogatory words for women's reproductive anatomy such as 'p--y' and 'c--t,'" which was "sufficient to establish that [his] behavior was based on gender").[2]

In the instant case, and as will be discussed below, Plaintiff points to two instances in which Mr. Stamm called her a "b--h" and two instances in which he called her a "c--t."  (*See* ECF Nos. 25-21 at 35; 30-8 at 2, 4, 11; 30-9 at 8.)  Mr. Stamm's two-time use of the word "b--h," over the time period of 2009 through 2013, likely supports an inference that "its use was merely an offensive epithet, and not based on sex."  *Davis*, 2016 U.S. Dist. LEXIS 2106, at *18 n.9.  *See also Kidd*, 37 F. App'x at 593 (one-time use of "b--h" was not sexual harassment); *Reyes*, 997 F. Supp. at 617 (referring to the plaintiff on two occasions as a "b--h" did not show that she was discriminated against because of her sex); *Koschoff*, 109 F. Supp. 2d at 336 (concluding that the use of the word "b--h" was not specifically motivated by the plaintiff's sex).  Nonetheless, a reasonable factfinder could view the evidence of Mr. Stamm using the word "c--t" as showing that Plaintiff's treatment was attributable to her sex.  *See Hegyes*, 2007 U.S. Dist. LEXIS 5368, at *20-21.  While Mr. Stamm used the word only twice, the issue of whether minimal use of the word "c--t" supports an inference that its use was an offensive epithet has never been addressed.  Accordingly, in viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has satisfied the first prong.

---

[2] The Court will not address Mr. Stamm's statement that he was "not going to play with [Plaintiff's] p--y and make her happy like Charlie Taylor did."  (ECF Nos. 25 ¶¶ 149, 151; 30 ¶¶ 149, 151, 399-400; 33 ¶¶ 399-400.)  Mr. Stamm made this statement when he spoke with Mr. Reffner on the telephone on July 3, 2013, outside the presence of Plaintiff.  *See, e.g.*, *Spangler v. City of Philadelphia*, 523 F. App'x 142, 144-46 (3d Cir. 2013) (affirming summary judgment where a supervisor referred to the plaintiff as a "b--h" outside her presence); *Davis*, 2016 U.S. Dist. LEXIS 2106, at *18 n.9 ("Pearlingi's reference to Plaintiff as a 'dumb bitch,' and Cavallaro's statement that he wanted SEPTA management to 'keep that fucking bitch' away from him—both of which occurred outside Plaintiff's presence—do not constitute intentional discrimination because of her sex.").

### ii.    Prong Two

With respect to the second prong, the Court must determine whether the totality of the circumstances indicates that the alleged harassment by Mr. Stamm was "sufficiently severe or pervasive." *Martinez*, 290 Fed. Appx. at 524. "The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006). In examining the second prong, the Court must look to the frequency of the alleged conduct, the severity of the conduct, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with work performance, or whether the conduct amounted to nothing more than mere offensive utterances. *Id.* (citing *Harris*, 510 U.S. at 23). "The threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). The work environment must have been so permeated with discriminatory conduct that it objectively altered Plaintiff's conditions of employment and created an "abusive working environment." *Id.* at 173-74 (citing *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001); *Saxe v. State College Area School Dist.*, 240 F.3d 200, 205 (3d Cir. 2001)).

During the time period of 2009 until 2014 (*see* ECF No. 30-8 at 2), Plaintiff encountered the following while she was working for Defendant:

- Mr. Stamm used words such as "b--h" and "c--t" directed at Plaintiff. (ECF No. 30-2 at 37; *see also* ECF Nos. 25 ¶ 66; 30 ¶ 66; 33 ¶ 66.)
- Plaintiff testified that the name calling occurred three times a week and that sometimes it could be a few times a day. (ECF Nos. 30-8 at 2-4, 6; 30-9 at 9.)

- In 2010 or 2011, Mr. Stamm pulled his pants down and mooned Plaintiff, which made her feel uncomfortable. (ECF Nos. 30-2 at 37; 30-8 at 3; 30-9 at 6, 8; *see also* ECF Nos. 25 ¶ 66; 30 ¶ 66; 33 ¶ 66.)
- When Plaintiff asked which flaggers were needed, Mr. Stamm stated, "Just you, just f--ing you." (ECF No. 30-2 at 17.)
- Mr. Stamm screamed profanities at Plaintiff and told her to keep her f--ing mouth shut and that's how people lose their jobs. (ECF Nos. 30-2 at 38; 30-8 at 3; *see also* ECF Nos. 25 ¶ 75; 30 ¶¶ 75, 378-379; 33 ¶¶ 75, 378-379.) When Plaintiff told him that he could move her to another crew, Mr. Stamm asked her to get into a truck, squeezed her shoulder, and asked if they were okay. (ECF Nos. 30-2 at 37-38; 30-9 at 10; *see also* ECF Nos. 25 ¶¶ 76-77; 30 ¶¶ 76-77, 388; 33 ¶¶ 76-77, 388.)
- Mr. Stamm grabbed Plaintiff's shoulders in a threatening manner. (ECF No. 30-8 at 3.)
- Mr. Stamm made sexual comments to female employees. (*Id.* at 4.)
- When signs needed to be picked up, Mr. Stamm called the company telephone and asked Plaintiff, "Where the f--k are you? Get your a-- down here and get this f--ing picked up now." (ECF No. 30-2 at 39.) At the end of the day, Mr. Stamm told Plaintiff that "you're the only f--ing flagger we're going to need tomorrow." (*Id.*)
- Mr. Stamm told Plaintiff to "move [her] a--," to "get in the truck, b--h," to "get the f--ing flaggers out," and to "f--ing hustle." (ECF Nos. 30-8 at 2, 11; 30-9 at 8.)
- Mr. Stamm called Plaintiff a "fat, stupid c--t." (ECF No. 25-21 at 35.)
- Mr. Stamm told his crew members that Plaintiff was his "b--h" and that she would "lose that a--" working for him. (ECF No. 30-8 at 2.)
- Mr. Stamm told Plaintiff to "get your a-- back down here, you stupid c--t." (*Id.* at 4.)
- Mr. Stamm yelled at Plaintiff for sending text messages to another female employee. (ECF Nos. 25-21 at 6, 11; 30-8 at 5.)
- Mr. Stamm placed his hands on Plaintiff's back side on multiple occasions. (ECF No. 30-8 at 6.)
- When cones needed to be set out, Mr. Stamm told Plaintiff, "You need to get down here and get some f--ing cones up down here now," to "get that f--ing car out of there," and to "go get the f--ing T Tag." (ECF No. 30-2 at 39-40.)
- Mr. Stamm told Plaintiff to take off her "f--ing sunglasses" and told Plaintiff and another female to "get [your] f--ing a--es back down here." (ECF No. 30-8 at 4; 30-9 at 8; *see also* ECF Nos. 25-21 at 33; 30 ¶ 368; 33 ¶ 368.)
- When Plaintiff placed a paint can on the floor of a truck, Mr. Stamm grabbed her, told her to "get in the f--ing truck," pointed to the cup holder and said "this is where the f--ing paint can goes," and told her that if she put a can of paint on the floor again then she would be "the first full-time f--ing flagger that [Defendant] had." (ECF Nos. 30-8 at 3; 30-9 at 9; *see also* ECF Nos. 25 ¶ 66; 30 ¶ 66; 33 ¶ 66.)

- In 2014, while working with another crew, Plaintiff received a Hurt Feelings Report, which asked for the "[r]easons for filing this report" and listed reasons such as, "I am thin skinned;" "I am a p--y;" "I have women[-]like hormones;" "I am a qu--r;" "I am a little b--h;" "I am a crybaby;" "I want my mommy;" and "ALL OF THE ABOVE." (ECF Nos. 30-2 at 26, 42-43; 30-8 at 14; 30-9 at 7, 14-15; *see also* ECF Nos. 30 ¶ 435; 33 ¶ 435.)
- For the next two weeks, Plaintiff's co-workers made fun of her and mimicked her while she was being trained to use a roller. (ECF Nos. 30-8 at 15-16; 30-9 at 18-19, 25-26.) Mr. Becker called Plaintiff a "b--h." (ECF No. 30-8 at 16.)

Plaintiff alleges that Mr. Stamm used several profanities, including "a--," "b--h," "c--t," and variations of the word "f--k." In her affidavit, Plaintiff states that Mr. Stamm used inappropriate language like "b--h" and "c--t" at least three times a week and, overall, more than 500 times. (ECF Nos. 30-8 at 2-4, 21; 30-9 at 9.) However, the Court's review of the undisputed material facts establishes that Plaintiff has only identified a few instances where Mr. Stamm told Plaintiff to "get in the truck, b--h," called her a "fat, stupid c--t," told his co-workers that Plaintiff was his "b--h," and told Plaintiff she was a "stupid c--t." (*See* ECF Nos. 25-21 at 35; 30-8 2, 4, 11; 30-9 at 8.) Indeed, even Plaintiff's diary entries, which she kept from April 2012 until October 2013, reveal only the instance in which Mr. Stamm called her a "fat, stupid c--t." (ECF No. 25-21 at 35.)

Given the Court's extensive review of the thousands of pages that the parties have filed in relation to Defendant's motion summary judgment, it will not credit Plaintiff's "unsubstantiated estimation" that Mr. Stamm called her a "b--h" and "c--t" more than 500 times during the time period of 2009 until 2013. *Dreshman v. Henry Clay Villa*, 733 F. Supp. 2d 597, 613 (W.D. Pa. 2010) ("While Plaintiff testified that he was subject to sexual harassment half the time that he worked, when questioned about this estimate at his deposition, he only identified a number of discrete events or incidents of harassing conduct[;] thus, the Court will not credit

Plaintiff's unsubstantiated estimation."); *see also Lacy v. AMTRAK*, 507 F. Supp. 2d 438, 446 (D. Del. 2007) (granting summary judgment as to the plaintiff's hostile work environment claim because despite her claim that she had "'an abundance of evidence'" to support her allegations, the plaintiff "ha[d] not provided that evidence to the Court"); *Stephenson v. City of Philadelphia*, No. 05-CV-1550, 2006 U.S. Dist. LEXIS 43998, at *32 n.2 (E.D. Pa. June 27, 2006) (declining to credit the plaintiff's "unsubstantiated allegations that discriminatory treatment occurred 'all the time'").

Mr. Stamm's use of the word "b--h" on a few occasions and "c--t" on a few occasions, over the time period of 2009 until 2013, is insufficient to establish that his harassment of Plaintiff was "sufficiently severe or pervasive." *Martinez*, 290 Fed. Appx. at 524. Well-settled law establishes that instances where such profanities are used regularly, based upon substantiated evidence, are often insufficient to establish that the harassment is severe or pervasive. *See, e.g., Grassmyer v. Shred-It USA, Inc.*, 392 Fed. Appx. 18, 25, 30 (3d Cir. 2010) (affirming that the plaintiff's allegations that her manager regularly made comments about the size of his genitalia and about the details of his sexual relationships and that he referred to women as "b--hes" were not "so 'severe or pervasive' as to support a hostile work environment claim"); *Makse v. Spirit Airlines, Inc.*, No. 09-CV-2392, 2011 U.S. Dist. LEXIS 32759, at *11-13 (D.N.J. Mar. 28, 2011) (granting summary judgment on the plaintiff's hostile work environment claim where her time-barred allegations that her supervisor told her co-workers that she was a "f--ing b--h," a "f--ing c--t," and a "w--e" were unsubstantiated); *Ostrowski v. Prudential Equity Group, LLC*, No. 3:03-CV-0459, 2006 U.S. Dist. LEXIS 32970, at *16 (M.D. Pa. May 12, 2006) (granting summary judgment on the plaintiff's hostile work environment claim where the evidence established that

a branch manager called the plaintiff "a 'fucking bitch' on at least five occasions"); *Evans v. Lowe's Home Ctrs., Inc.*, No. 3:04-CV-0439, 2005 U.S. Dist. LEXIS 21235, at *3, 17-18 (M.D. Pa. Sept. 26, 2005) (finding that the use of the word "f--ing b--h" fifteen to thirty times was not severe or pervasive); *Staples v. Hill*, No. 3:97-CV-0580, 1999 U.S. Dist. LEXIS 21659, at *12, 20-21 (M.D. Pa. Aug. 20, 1999) (finding that the use of the words "b--h" and "c--t" was not severe or pervasive). As a result, Plaintiff's allegation that Mr. Becker called her a "b--h" in 2015 is also insufficient.

Plaintiff details several instances where Mr. Stamm used variations of the word "f--k," and Mr. Stamm's use of the word constitutes the majority of the profanities that Plaintiff alleges that Mr. Stamm used. As discussed above, Mr. Stamm stated: "Just you, just f--ing you;" "Where the f--k are you?;" "Keep [your] f--ing mouth shut;" "Get this f--ing picked up now;" "You're the only f--ing flagger we're going to need tomorrow;" "You need to get down here and get some f--ing cones up down here now;" "Get that f--ing car out of there;" "Go get the f--ing T Tag;" "Get the f--ing flaggers out;" "F--ing hustle;" "[Take off your] f--ing sunglasses;" "Get [your] f--ing a--es back down here;" "Get in the f--ing truck;" "this is where the f--ing paint can goes;" and "[You will be] the first full-time f--ing flagger that [Defendant] had." (ECF Nos. 30-2 at 17, 38-40; 30-8 at 2-4, 11; 30-9 at 8-9; *see also* ECF Nos. 25 ¶¶ 66, 75; 25-21 at 33; 30 ¶¶ 66, 75, 368, 378-379; 33 ¶¶ 66, 75, 368, 378-379.)

Based upon this evidence, Mr. Stamm used variations of the word "f--k" on fifteen occasions over the time period of 2009 until 2013. (*See id.*) Additionally, Plaintiff has outlined occasions where Mr. Stamm used the word three times in one day, thus decreasing the number of days over which Mr. Stamm used the word. Even if Mr. Stamm had used variations of the

word "f--k" on fifteen occasions on fifteen different days, Plaintiff would still be unable to establish that his use of the word created a hostile work environment that was severe and pervasive because "offensive language does not constitute harassment." *Staples*, 1999 U.S. Dist. LEXIS 21659, at *21 (citing *Harris*, 510 U.S. at 21 ("[M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect conditions of employment to implicate Title VII.")). *See also Grassmyer*, 392 Fed. Appx. at 25, 30 (affirming that the plaintiff's allegations that her manager "frequently used the word 'fuck' in the office" were not "so 'severe or pervasive' as to support a hostile work environment claim"); *Exantus v. Harbor Bar & Brasserie Restaurant*, 386 Fed. App'x 352, 354 (3d Cir. 2010) (concluding that reference to the plaintiff as a "Haitian F--k" was not sufficiently severe or pervasive to support a hostile work environment claim); *Fred v. Pennsylvania*, No. 3-12:CV-2480, 2015 U.S. Dist. LEXIS 81184, at *6-8, 33-35 (M.D. Pa. June 22, 2015) (noting that the plaintiff's allegations that he was called "a 'fucking spic'" and "a fucking asshole" were not sufficiently severe or pervasive); *Davis v. Solid Waste Servs., Inc.*, 20 F. Supp. 3d 519, 534 (E.D. Pa. 2014) ("A plaintiff does not establish a hostile work environment under Title VII merely by showing that he had a demanding and profanity-prone manager."); *Noel v. Boeing Co.*, No. 06-CV-2673, 2008 U.S. Dist. LEXIS 37514, at *63-65 (E.D. Pa. May 7, 2008) (granting summary judgment where the plaintiff was repeatedly called an "a--hole," a "motherf--er," and a "f--ing Haitian" over several years); *Moyer v. Kaplan Higher Educ. Corp.*, 413 F. Supp. 2d 522, 525 (E.D. Pa. 2006) (granting summary judgment where the plaintiff claimed that profane language was used approximately three times per week); *Barbosa v. Tribune Co.*, No. 01-CV-1262, 2003 U.S. Dist. LEXIS 19483, at *15-19 (E.D. Pa. Sept. 25, 2003) (concluding that seven specific instances of discrimination in an

eighteen-month period, including three times the plaintiff was called a "f--ing spic," did not demonstrate a hostile environment); *Reyes*, 997 F. Supp. at 617, 619 (finding that the use of the word "f--k" multiple times over a seven-day period was not "cumulatively regular or pervasive enough"); *Lombardi v. Cosgrove*, 7 F. Supp. 2d 481, 495 (D.N.J. 1997) (finding that the plaintiff's supervisor's use of the word "f--k" did not support a hostile work environment claim). While Mr. Stamm's profane language was "boorish and uncouth, it does not rise to the level of creating a hostile workplace environment." *Lozosky v. Keystone Bus. Prods.*, No. 3:13-CV-0512, 2013 U.S. Dist. LEXIS 151891, at *8 (M.D. Pa. Oct. 23, 2013); *see also Johnson v. PSI Pizza, Inc.*, No. 3:11-CV-1698, 2014 U.S. Dist. LEXIS 4188, at *17 (M.D. Pa. Jan. 14, 2014) (same).

Plaintiff's allegations that Mr. Stamm touched her, by grabbing her, squeezing her shoulder, and touching her back side, are more egregious than her allegations regarding Mr. Stamm's use of profanities. Nonetheless, Plaintiff's allegations are insufficient to establish that Mr. Stamm's conduct was sufficiently severe and pervasive to establish her claim for a hostile work environment. Plaintiff asserts that Mr. Stamm has sexually propositioned her more than 100 times and has touched her inappropriately more than fifty times. (ECF No. 30-8 at 21.) However, the Court's review of the undisputed material facts establishes that Plaintiff has only identified one instance where Mr. Stamm grabbed Plaintiff after she placed a paint can on the floor of a truck and one instance where Mr. Stamm squeezed Plaintiff's shoulder and asked if they were okay. (*See* ECF Nos. 30-2 at 37-38; 30-8 at 3; 30-9 at 9-10; *see also* ECF Nos. 25 ¶¶ 66, 76-77; 30 ¶¶ 66, 76-77, 388; 33 ¶ 66, 76-77, 388.)

As discussed above, the Court will not credit Plaintiff's "unsubstantiated estimation" that Mr. Stamm sexually propositioned her more than 100 times and has touched her

inappropriately more than fifty times. *Dreshman*, 733 F. Supp. 2d at 613; *Lacy*, 507 F. Supp. 2d at 446; *Stephenson*, 2006 U.S. Dist. LEXIS 43998, at *32 n.2. Plaintiff's substantiated allegations do not rise to the level of creating a hostile workplace environment. *See, e.g., Lozosky*, 2013 U.S. Dist. LEXIS 151891, at *8 (finding that the plaintiff's allegations that her boss greeted her with hugs and kisses, that her boss and coworkers used sexual profanity around her, and that she was forced to attend a private meeting at her boss's home, where he greeted her with a hug and kiss and sat directly next to her, did not rise to the level of being severe and pervasive); *Funayama v. Nichia Am. Corp.*, No. 08-CV-5599, 2011 U.S. Dist. LEXIS 40016, at *6, 36 (E.D. Pa. Apr. 13, 2011) (president of the plaintiff's company kissing her, groping her on the sides of her breasts, and asking her out did not create a hostile work environment); *Dreshman*, 733 F. Supp. 2d at 613-14 (finding that the plaintiff's allegations that his co-workers "goosed" him, pinched his buttocks, and made sexually charged comments toward him were not sufficiently severe or pervasive); *Jankowski v. Sage Corp.*, No. 08-CV-770, 2010 U.S. Dist. LEXIS 27776, at *2-3, 23 (W.D. Pa. Feb. 23, 2010) (supervisor's twice placing his hands on plaintiff's shoulder and back and rubbing; four instances of brushing up against plaintiff; and making sexual comments in one conversation were not severe and pervasive); *Kraus v. Howroyd-Wright Empl. Agency, Inc.*, No. 06-CV-975, 2008 U.S. Dist. LEXIS 1254 (E.D. Pa. Jan. 8, 2008) ("Sexually charged comments, one sexually explicit phone call, banter about helping [the plaintiff] find a permanent job in exchange for sex, and an attempt to hug her do not show that the workplace was permeated with insults and discriminatory actions."); *Swanson v. Northwestern Human Servs.*, No. 05-CV-3054, 2006 U.S. Dist. LEXIS 83846, at *7-8 (E.D. Pa. Nov. 30, 2006) (allegations that the plaintiff's supervisor touched his buttocks once and told him that he looked good in his jeans were

insufficient); *Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001)

(supervisor touching the plaintiff's breasts and buttocks without consent and removing a bottle

of wine from his pants and offering plaintiff a drink was not pervasive and severe enough to

create hostile work environment); *Bonora v. UGI Utils., Inc.*, No. 99-CV-5539, 2000 U.S. Dist.

LEXIS 15172, at *11 (E.D. Pa. Oct. 18, 2000) (concluding that the employee's conduct, including

staring at the plaintiff's chest, touching her hand, brushing his buttocks against hers, and

touching her waist, was not severe or pervasive); *McGraw v. Wyeth-Ayerst Lab.*, No. 96-CV-5780,

1997 U.S. Dist. LEXIS 20813, at *17-18 (E.D. Pa. Dec. 23, 1997) (supervisor kissing the plaintiff

without consent, forcing his tongue into her mouth, touching her face, and repeatedly asking

her out on dates was insufficient to create hostile work environment).

Plaintiff has also alleged that Mr. Stamm "mooned" her on one occasion. (ECF Nos. 30-2

at 37; 30-8 at 3; 30-9 at 6, 8; *see also* ECF Nos. 25 ¶ 66; 30 ¶ 66; 33 ¶ 66.) Such conduct, which

occurred once during the time period of 2009 until 2013, is reprehensible but is insufficient to

establish Plaintiff's claim for a hostile work environment. *Compare Bacone v. Phila. Hous. Auth.*,

No. 01-CV-419, 2003 U.S. Dist. LEXIS 8818, at *14 (E.D. Pa. May 6, 2003) ("Although the one

incident of offensive touching and one incident where [a co-worker] briefly exposed herself to

[the plaintiff] were reprehensible, they were not severe so as to alter a term of his

employment."); *and Seldomridge v. Uni-Marts, Inc.*, No. 99-CV-496, 2001 U.S. Dist. LEXIS 9491, at

*2, 25-27 (D. Del. July 10, 2001) (granting summary judgment where male supervisor surprised

female employee by posing nude in doorway to storage room), *with Randler v. Kountry Kraft*

*Kitchens*, No. 1:11-CV-0474, 2012 U.S. Dist. LEXIS 177926, at *7, 24-27 (M.D. Pa. Dec. 17, 2012)

(denying summary judgment where two of the plaintiff's co-workers mooned her, one pulled

down his pants in front of her, several placed figurines in the shape of sexual body parts on her workstation, one asked to place his head on her breasts, and one threw a gum wrapper at her breasts); *and Flick v. Aurora Equip. Co.*, No. 03-CV-2508, 2004 U.S. Dist. LEXIS 1171, at *6-7, 12-13 (E.D. Pa. Jan. 13, 2004) (denying summary judgment where, over a period of five months, one of the plaintiff's co-workers "would moon [her] and pull up his shirt to show [her] his 'hairy chest,'" one simulated masturbation in front of her on a daily basis, one followed her into the women's restroom several times, one grabbed his crotch in front of her, one engaged her in sexually explicit conversations, and several urinated outside a door near where the plaintiff worked).

The remainder of Plaintiff's hostile work environment claim is premised upon two incidents involving the behavior of her other co-workers following Mr. Stamm's termination. First, Plaintiff alleges that she received a Hurt Feelings Report from Mr. McClure. (ECF Nos. 30-2 at 26, 42-43; 30-8 at 14; 30-9 at 7, 14-15; *see also* ECF Nos. 30 ¶ 435; 33 ¶ 435.) Initially, the Court notes that case law within the Third Circuit has not addressed a "Hurt Feelings Report." Nonetheless, it is well settled that "isolated incidents or comments are generally insufficient to state a claim." *See Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). Moreover, courts that have addressed Hurt Feelings Reports have found that the receipt of such a report is insufficient. *See, e.g., Roberts v. Office of the Sheriff for Charles County*, No. 10-CV-3359, 2012 U.S. Dist. LEXIS 93, at *22-25, 27 (D. Md. Jan. 3, 2012) (dismissing the plaintiff's claim for a hostile work environment and, in relation to the plaintiff's retaliation claim, explaining that his receipt of a Hurt Feelings Report was "a prime example of a 'petty slight'") (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (U.S. 2006) ("An employee's decision to report

discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.")). *See also Sanchez v. California*, 90 F. Supp. 3d 1036, 1058 (E.D. Cal. 2015) (describing a Hurt Feelings Report as "juvenile" and "inappropriate in any situation" but concluding that it was a "petty slight" that did not constitute an adverse employment action). Accordingly, the Court finds that Plaintiff's one-time receipt of the Hurt Feelings Report, while inappropriate, is insufficient to rise to the level of establishing a hostile work environment that was severe and pervasive.

Second, Plaintiff alleges that, following Mr. Stamm's termination, her co-workers made fun of her and mimicked her while she was being trained to use a roller. (ECF Nos. 30-8 at 15-16; 30-9 at 18-19, 25-26.) Plaintiff asserts that this conduct occurred from May 30, 2014, until she resigned on June 17, 2014. (ECF No. 30-8 at 15-16.) It is well settled that "teasing" and "offhand comments" are insufficient to establish a hostile work environment. *Abramson*, 260 F.3d at 280; *see also Boyer v. Johnson Matthey, Inc.*, No. 02-CV-8382, 2005 U.S. Dist. LEXIS 171, at *58 (E.D. Pa. Jan. 7, 2005) ("Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment."). Accordingly, the Court finds that Plaintiff's allegations that her co-workers mimicked her, mocked her, and required her to perform menial tasks are insufficient to establish a hostile work environment that was severe and pervasive. *Compare Ventura v. Montclair State Univ.*, No. 08-CV-5792, 2011 U.S. Dist. LEXIS 145673, at *34-35 (D.N.J. Dec. 19, 2011) (finding the plaintiff's claim that his supervisor "at times mocked him" by "regularly laugh[ing] at [him]," stating that the plaintiff "babble[d]" when he talked, and mocked the plaintiff's need to use glasses did not raise a genuine issue of material fact on his claim for a hostile work environment); *Incorvati v.*

*Best Buy Co. Inc.*, No. 10-CV-1930, 2010 U.S. Dist. LEXIS 122038, at *33-34 (D.N.J. Nov. 16, 2010) (dismissing hostile work environment claim where the plaintiff alleged that he was ridiculed because of his age and because he had suffered a heart attack, and where, on one occasion, he was sent a picture of a wheel chair/motorized scooter in a mocking manner); *and Shramban v. Aetna*, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003) ("[I]ncidents of Defendant's alleged harassing behavior, such as improper personal comments and mimicking Plaintiff's accent, were neither severe nor sufficiently continuous, concerted or prolonged to alter conditions of employment as required by a hostile work environment claim."), *with Martsolf v. United Airlines, Inc.*, No. 13-CV-1581, 2015 U.S. Dist. LEXIS 91269, at *35 (W.D. Pa. July 14, 2015) (denying summary judgment where the plaintiff, who had a disability, alleged that her co-workers called her stupid and a dummy, made faces at her, and "constantly screamed at her when she could not hear them, complained when they could not understand her, and mocked and imitated the way that she spoke"); *Oji v. Gannett Fleming, Inc.*, No. 11-CV-7206, 2015 U.S. Dist. LEXIS 30797, at *17-18 (D.N.J. Mar. 13, 2015) (denying summary judgment where the plaintiff's co-workers said he had "a small penis," used "the N word," called the plaintiff a drug dealer, and mimicked the plaintiff's accented speech). *See also Kimes v. Univ. of Scranton*, No. 3:14-CV-91, 2015 U.S. Dist. LEXIS 111955, at *7-8, 40-41 (M.D. Pa. Aug. 25, 2015) (granting summary judgment where the plaintiff alleged that she was required to complete menial tasks, while other officers gathered around her and laughed, from 2005 through 2010). For the foregoing reasons, the Court concludes that Plaintiff has failed to meet her burden with respect to the second prong requiring that the alleged harassment was "sufficiently severe or pervasive." *Martinez*, 290 Fed. Appx. at 524.

As discussed above, the Court must determine whether the totality of the circumstances indicates that the alleged harassment was "sufficiently severe or pervasive." *Martinez*, 290 Fed. Appx. at 524; *see also O'Connor*, 440 F.3d at 128 ("[T]he 'hostile work environment' theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by defendant."). Having reviewed the totality of the circumstances, the Court concludes that the cumulative effect of the alleged harassment, which took place over the course of five years, was not sufficiently severe or pervasive to satisfy the third prong. *Compare Davis*, 2016 U.S. Dist. LEXIS 2106, at *26 (excluding the conduct not based on the plaintiff's sex and finding that "a few inappropriate comments and gestures made over approximately eighteen months . . . do not rise to the level of being severe or pervasive"); *and Pugliese v. Cnty. of Lancaster*, No. 12-CV-7073, 2016 U.S. Dist. LEXIS 9989, at *51-52 (E.D. Pa. Jan. 27, 2016) (finding that the plaintiff had failed to submit evidence of sexual harassment and explaining that "Title VII 'does not set forth a general civility code for the American workplace'") (quoting *Burlington Northern & Santa Fe Ry.*, 548 U.S. at 68), *with Barroso v. Lidestri Foods, Inc.*, 937 F. Supp. 2d 620, 632 n.9 (D.N.J. 2013) (determining that the cumulative effect of a shift manager repeatedly touching the plaintiff's shoulder and leg, referring to the plaintiff's genitalia, and touching himself in a sexually suggestive way was severe or pervasive).

### iii.    Prong Four

With respect to the fourth prong, the Court must determine whether Plaintiff has made a prima facie showing that the discrimination would detrimentally affect a reasonable person of the same sex in that position. "Conduct that is not severe or pervasive enough to create an

objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. "In determining whether the fourth prong, the objective test, is met, we must 'look[] at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Abramson*, 260 F.3d at 280 (quoting *Harris*, 510 U.S. at 23). "The objective standard protects the employer from the 'hypersensitive' employee, but still serves the goal of equal opportunity by removing the walls of discrimination that deprive a protected group member of self-respecting employment." *Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 357 (M.D. Pa. 2012).

As discussed extensively above, the Court cannot conclude that Plaintiff's allegations regarding the frequency of the discriminatory conduct and its severity are sufficient to establish a hostile work environment claim. Additionally, Plaintiff has not identified any substantiated claims detailing physically threatening or humiliating conduct. *Abramson*, 260 F.3d at 280. *See also Harris v. Harley-Davidson Motor Co. Operations, Inc.*, No. 1:09-CV-1449, 2011 U.S. Dist. LEXIS 139091, at *4, 23-25 (M.D. Pa. Sept. 28, 2011) (finding that the plaintiff's allegations that her co-worker stared at her for long periods of time, and up to an hour at a time on several occasions, failed to satisfy the fourth prong); *Green v. Port Auth. of N.Y. & N.J.*, No. 07-CV-3910, 2009 U.S. Dist. LEXIS 100871, at *39-40 (D.N.J. Oct. 29, 2009) (concluding that the plaintiff's supervisor's comments and actions were, at most, "intersexual flirting" that did not satisfy the fourth prong); *Stephenson*, 2006 U.S. Dist. LEXIS 43998, at *36 (holding that the plaintiff failed to meet the fourth prong because her allegations of harassment were not severe and pervasive and because

she failed to show the work environment impacted other females); *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 600 (M.D. Pa. 2002) (concluding that objective test was not met where the plaintiff failed to adduce evidence showing the frequency, severity, or impact upon her work performance).

"Evidence that others were harassed may tend to show that a plaintiff's claims are objectively reasonable." *West*, 45 F.3d at 757. As discussed above, Plaintiff has attached Ms. Graham's affidavit to her response in opposition to Defendant's motion for summary judgment. (ECF No. 30-15.) The Court has declined to strike Ms. Graham's affidavit and has stated that it will consider Ms. Graham's affidavit to the extent that the averments are related to the theory and circumstances of Plaintiff's case. *See supra* Part V.A. Ms. Graham states that she was required to complete menial tasks and that she was called names, such as "b--h," "woman," and "c--t." The Court has extensively addressed such name calling above and, more significantly, finds that Ms. Graham's allegations primarily relate to the conduct of Mr. Harzinski and her unnamed co-workers, against whom Plaintiff has not asserted any claims. Ms. Graham's allegations regarding Mr. Flood also do not relate to the circumstances of Plaintiff's case. *See Fusco v. Bucks County*, No. 08-CV-2082, 2009 U.S. Dist. LEXIS 118924 (E.D. Pa. Dec. 18, 2009) (finding that the plaintiff failed to satisfy the fourth prong because she relied "only on 'uncorroborated generalities'") (quoting *Duffy v. Dep't of State*, 598 F. Supp. 2d 621, 628 (D. Del. 2009)).

The Court notes that Mr. Stamm yelled when he was angry, and he used profanity and other foul language while on the job. (*See* ECF Nos. 25 ¶ 111; 30 ¶¶ 111, 352; 33 ¶¶ 111, 352.) He used profanity around male and female employees. (ECF Nos. 30-2 at 16; 30-8 at 2, 20.) In

2011, Plaintiff and two of her male co-workers shared their concerns regarding Mr. Stamm with Ms. Dick and Mr. Flood.  (*See* ECF Nos. 25 ¶¶ 68, 70-72; 30 ¶¶ 68, 70-72, 375; 33 ¶ 375.)  Mr. Stamm called Mr. Hutchinson names, such as "r--d."  (ECF Nos. 25 ¶ 113; 30 ¶ 113.)  In 2013, Mr. Hutchinson, Mr. Buynak, and Mr. Harzinski complained about Mr. Stamm's behavior on the job site, at which point Mr. Stamm was terminated.  (ECF Nos. 25 ¶¶ 92, 193-194, 330; 30 ¶¶ 92, 193-194, 330; 33 ¶ 193.)  Because Mr. Stamm directed his profanities and name calling at both men and women, he could be considered to be "an equal opportunity harasser."  *See, e.g.*, *Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 420 (W.D. Pa. 2010) (finding that the supervisor yelled at both men and women and thus did not discriminate between them); *Connell v. Principi*, No. 04-CV-1356, 2007 U.S. Dist. LEXIS 81822, at *29-41 (W.D. Pa. Nov. 5, 2007) (holding that male employees could not maintain sexual harassment claim against a female co-worker who yelled at and physically threatened them, even when some incidents had a sexual component to them, because she treated female co-workers in the same way).

Plaintiff also used profanities on the job site, stating, "You tell [Mr. Stamm] the f--ing truck is at the quarry and he can take the cell phone and shove it up his a--."  (ECF Nos. 25 ¶ 146; 30 ¶ 146; *see also* ECF No. 30-2 at 16.)  She admitted to raising her middle finger and gesturing toward Mr. McClure on the job site.  (ECF Nos. 25 ¶ 255; 30 ¶ 255.)  Because the use of profanities was not abnormal at the job site, as used by Mr. Stamm toward men and women and as used by Plaintiff, the Court cannot conclude that such conduct would detrimentally affect a reasonable person of the same sex in that position.  *See West*, 45 F.3d at 757 (finding evidence of harassment of other employees *on the basis of membership on a protected class* relevant to plaintiff's

hostile work environment claim) (emphasis added).  Accordingly, Plaintiff has failed to satisfy the fourth prong.

### iv.    Prong Five

With respect to the fifth prong, Plaintiff must demonstrate the existence of respondeat superior liability.  When a plaintiff seeks to establish respondeat superior liability, "the basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a co-worker."  *Huston*, 568 F.3d at 104. Determining whether an individual has sufficient supervisory power is a fact-intensive inquiry principally hinging upon whether an employee is sufficiently senior that knowledge of discrimination is important to his or her managerial duties.  *Id*. at 107.

If a harasser is the victim's supervisor, then the employer may be held strictly liable.  *Id*. The Supreme Court has clarified that an individual qualifies as a supervisor in harassment actions "only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (internal quotations omitted).  If no tangible employment action is taken, the employer may raise an affirmative defense to liability or damages by showing:  "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  When tangible employment action has been taken,

strict liability attaches, and the employer cannot avail itself of the *Faragher-Ellerth* affirmative defense.

On the other hand, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S. Ct. at 2439. To make such a showing, a plaintiff must demonstrate that the employer was "'negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment.'" *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997)). An employer therefore may be directly liable for a co-worker's harassment if the employer failed to provide a reasonable avenue for complaint or, alternatively, if it knew or should have known of the harassment and failed to take prompt remedial action. *Huston*, 568 F.3d at 104; *Hitchens v. Montgomery Co.*, 278 F. App'x 233, 236 (3d Cir. 2008); *Andreoli*, 482 F.3d at 644. "An effective grievance procedure—one that is known to the victim and that timely stops the harassment—shields the employer from Title VII liability for a hostile environment." *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 110 (3d Cir. 1994). "Prompt remedial action" is conduct "reasonably calculated to prevent further harassment." *Id.*; *Bonenberger*, 132 F.3d at 26. However, this should not be taken to mean that an employer's *investigation* into discriminatory activity must be perfect – or even adequate. *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997). Further, "even if a remedial action does not effectively end the alleged harassment, it may still be legally 'adequate' if it was 'reasonably calculated to do so." *Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (citing *Jensen*, 435 F.3d at 453). When the employer's response stops the harassment, there can be no employer liability under Title VII as a matter of law. *Weston*, 251 F.3d at 427; *Bouton*, 29 F.3d at 110 ("By definition,

there is no negligence if the [sexual harassment grievance] procedure is effective.").  In such situations, the employee cannot require the employer to choose a certain remedial action. *Knabe*, 114 F.3d at 414.

In the instant case, Plaintiff testified that Ms. Davis asked her in August 2009 if she would be interested in a full-time laborer position.  (ECF No. 30-2 at 10.)  Approximately one month later, Mr. Stamm asked Plaintiff if she was interested in the position.  (*Id.*)  After Plaintiff responded affirmatively, Mr. Mills arrived with paperwork, which Plaintiff signed on the trunk of his car.  (*Id.*)  Similarly, Mr. Hutchinson testified that when he refused to work on Sunday, Mr. Stamm hung the telephone up on him and "from that point on, I wasn't allowed on any jobs that he was in control of."  (ECF No. 30-4 at 20.)  Mr. Stamm confirmed that he "could go to [Mr.] Miller and say, 'hey, this person is no good for whatever reason, I want them out of here, terminated, sent to another crew.'"  (ECF No. 25-16 at 119.)

When employees were called back to work, Mr. Stamm called them.  (ECF Nos. 30-4 at 30; 30-7 at 33-34.)  When there were layoffs, Mr. Stamm "picked who he wanted to work."  (ECF No. 30-4 at 75; *see also* ECF No. 30-2 at 23.)  Mr. Reffner testified that when hiring decisions are made, he involves "the person [who] will be supervising the position that the person's being hired into."  (ECF No. 30-5 at 11-12.)  If the position was for a paver, Mr. Reffner involved individuals at the general manager level, such as a superintendent or a general superintendent.  (*Id.* at 12.)

Mr. Reffner testified that disciplinary matters are a collaborative effort that includes Defendant's superintendents.[3]  (ECF No. 30-5 at 13.)  Mr. Reffner stated that he makes disciplinary recommendations and then "advise[s] the employee's manager of what action needs to be taken."  (Id.)  Plaintiff has stated that Mr. Stamm disciplined employees, (ECF No. 30-8 at 19), and Mr. Stamm testified that he was required to advise Mr. Miller of his complaints about an employee's performance before any action could be taken, (ECF No. 25-16 at 119-20).

The record reveals a situation in which an employer has "concentrate[d] all decisionmaking authority in a few individuals" but has also "effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance*, 133 S. Ct. at 2452 (citing *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work—certainly more familiar with it than the off-site Department Administrative Services Manager.")).  While Mr. Stamm *alone* did not have the authority to hire, fire, promote, or reach a decision causing a significant change in benefits, he could make recommendations, upon which Defendant relied.  Defendant therefore "effectively delegated the power to take tangible employment actions" to Mr. Stamm.  *Vance*, 133 S. Ct. at 2452; *see also Cacciola v. Work N Gear*, 23 F. Supp. 3d 518, 530 (E.D. Pa. 2014) (finding respondeat superior liability attached where the harasser could "recommend" termination but did not "have the authority singly to terminate") (citing *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 738 (10th Cir. 2014) ("A manager who works closely with his or her subordinates

---

[3] Mr. Stamm stated that a foreman and a superintendent are the same thing.  (ECF No. 25-16 at 13.)

and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII."); *Isenhour v. Outsourcing of Millersburg, Inc.*, No. 1:14-CV-1170, 2015 U.S. Dist. LEXIS 144578, at *26-27 (M.D. Pa. Oct. 26, 2015) (finding that the harasser was a supervisor because she had the authority to supervise and discipline the plaintiff). Accordingly, the Court concludes that, in viewing the record in the light most favorable to Plaintiff, Mr. Stamm was a supervisor. Respondeat superior liability therefore attaches, and, if tangible employment action has been taken, Defendant may be strictly liable for Mr. Stamm's conduct.

### v. *Faragher-Ellerth* Affirmative Defense

In two companion cases, the Supreme Court set forth the *Faragher-Ellerth* affirmative defense to claims of a hostile work environment as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 765 (internal citations omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). "The defense depends on the reasonableness of both the employer's and the plaintiff's preventative and remedial measures." *Cardenas v. Massey*, 269 F.3d 251, 266 (3d Cir. 2001). Additionally, "[t]hough not the only way to do so, an employer can establish its

affirmative defense by showing that it 'promulgated an antiharassment policy with complaint procedure' and that the plaintiff employee failed to avail herself of the procedure." *Tate v. Main Line Hosps., Inc.*, No. 03-CV-6081, 2005 U.S. Dist. LEXIS 1814, at *71 (E.D. Pa. Feb. 8, 2005) (quoting *Ellerth*, 524 U.S. at 765).

At the outset, the Court must determine whether a "tangible employment action" has been taken. If such an action has been taken, then Defendant may not avail itself of the *Faragher-Ellerth* affirmative defense. *See Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."). To establish that a supervisor's harassment *culminated* in a tangible employment action, "a plaintiff must show that the tangible employment action was related to, or caused by, the alleged unlawful harassment or retaliation." *Seybert v. Int'l Group, Inc.*, No. 07-CV-3333, 2009 U.S. Dist. LEXIS 63163, at *10-11 (E.D. Pa. July 6, 2009). As the Court explains in its analysis of Plaintiff's claims for constructive discharge and retaliation, *infra*, a "tangible employment action" has not been taken in this matter. Accordingly, Defendant may attempt to avail itself of the *Faragher-Ellerth* affirmative defense.

First, even in reviewing the facts in the light most favorable to Plaintiff, Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior. When Plaintiff and two of her male co-workers shared their concerns regarding Mr. Stamm in 2011 with Mr. Flood and Ms. Dick, Mr. Flood advised Plaintiff to sign a Check of Facilities form to indicate that she had a complaint. (ECF Nos. 25 ¶ 72; 30 ¶ 72.) Plaintiff refused to sign the form because Mr. Stamm was the individual who had given her the form, and she feared

retaliation.  (ECF Nos. 25 ¶ 73; 30 ¶ 73.)  Defendant contends that in response to Plaintiff's

refusal, Mr. Flood advised Plaintiff to contact the corporate office and speak with Mr. Miller.

(ECF No. 25 ¶ 74.)  Plaintiff denies Defendant's contention, asserting that Mr. Flood told her

that there was nothing he could do if she refused to sign the Check of Facilities Form.  (ECF No.

30 ¶ 72.)  The parties' dispute as to what occurred after Plaintiff reported her concerns in 2011 is

irrelevant because Plaintiff has admitted that Ms. Dick "went to the office and told somebody in

the office."  (ECF No. 30-9 at 10.)  After Mr. Stamm "got word of it from someone in the office,"

his behavior "calmed down . . . because he -- thinking he was going to get into trouble."  (Id.)

The Court further notes that, as discussed above, the conduct that Plaintiff revealed to Mr.

Flood and Ms. Dick did not constitute sexually harassing behavior.  Additionally, the Check of

Facilities form indicates that an employee may confidentially complete the form by contacting

the Employee Hotline or the Director of Human Resources.  (ECF No. 25-7 at 42; *see also* ECF

No. 25-13 at 23-42.)  Plaintiff's generalized fear of retaliation does not excuse her failure to

report sexual harassment.  *See, e.g.*, *Cacciola*, 23 F. Supp. 3d at 532 (rejecting the plaintiff's

argument that she did not report sexual harassment because "she presents no evidence that this

fear was grounded in anything") (citing *Gawley v. Indiana Univ.*, 276 F.3d 301, 312 (7th Cir. 2001)

(affirming summary judgment because the failure to report harassment "constitute[d] an

unreasonable failure to take advantage of the [employer's] corrective procedures")).  The Court

therefore cannot conclude that Defendant did not act reasonably in responding to Plaintiff's

complaint in 2011.

Plaintiff first reported Mr. Stamm's conduct to the human resources department in 2013.

(ECF No. 40 at 5-6; *see also* ECF No. 30-9 at 10.)  On May 23, 2013, Plaintiff met with Mr. Mills to

discuss Mr. Stamm. (ECF Nos. 30 ¶ 385; 33 ¶ 385.) At the end of the conversation, Mr. Mills stated that he would contact Mr. Stamm, discuss the matters, and get back in touch with Plaintiff. (ECF Nos. 30 ¶ 386; 33 ¶ 386.) After speaking with Mr. Stamm, Mr. Mills left Plaintiff a voicemail in which he stated that Mr. Stamm did not realize that there was a problem and that he felt things would be okay going forward. (*See* ECF Nos. 25 ¶¶ 83-84; 30 ¶¶ 83-84, 387; 33 ¶¶ 83-84, 387.)

According to Plaintiff, Mr. Stamm's behavior calmed down after this incident but worsened after one or two weeks. (*See* ECF Nos. 25 ¶ 78; 30 ¶ 78; 33 ¶ 78.) On June 25, 2013, Plaintiff again contacted Mr. Mills regarding Mr. Stamm. (*See* ECF No. 25 ¶ 87; 30 ¶ 87; 33 ¶ 87.) Mr. Mills advised Plaintiff to return to her home and to take some time off from work. (ECF No. 30 ¶ 392; 33 ¶ 392.) By the end of the day on June 25, 2013, Plaintiff had spoken with Mr. Mills, Ms. Dick, Mr. Miller, and Mr. Reffner. (*See* ECF Nos. 25 ¶ 93; 30 ¶ 93.) Mr. Reffner scheduled a meeting with Plaintiff for July 1, 2013, and the two agreed that, in the meantime, Plaintiff should not report to work. (*See* ECF Nos. 25 ¶ 94; 30 ¶¶ 94, 397; 33 ¶¶ 94, 397.) On July 1, 2013, Plaintiff met with Mr. Reffner and Mr. Miller to further discuss her complaints about Mr. Stamm and then completed, at least in part, an Avenues of Appeal Initial Review Form. (*See* ECF Nos. 25 ¶ 96; 30 ¶ 96; 33 ¶ 96.) Plaintiff remained off and was paid for two weeks while Defendant investigated her complaints. (*See* ECF Nos. 25 ¶ 95; 30 ¶ 95; *see also* ECF No. 30-2 at 48.)

After the meeting, Mr. Reffner spoke with Ms. Speck, Mr. Crain, Jr., Ms. Davis, Mr. Eyerly, Mr. Crain, Sr., and Ms. Quick regarding the incidents identified by Plaintiff. (ECF Nos. 25 ¶ 143; 30 ¶ 143.) During a telephone conversation, Mr. Reffner told Mr. Stamm that he was

required to participate in a meeting regarding Plaintiff's allegations and stated that he would prepare termination documents if Mr. Stamm did not report.  (ECF Nos. 25 ¶ 155; 30 ¶ 155.)  Mr. Stamm participated in a meeting with Mr. Reffner on July 9, 2013, at which time Mr. Stamm stated, in part, that he could perform his job without swearing and that he could continue to work with Plaintiff.  (See ECF Nos. 25 ¶¶ 156-57; 30 ¶¶ 156-57; 33 ¶¶ 156-57.)  Defendant and Mr. Stamm then entered into a Last Chance Agreement.  (ECF Nos. 25 ¶ 160; 30 ¶ 160.)  Mr. Reffner contacted Plaintiff that day and explained that his investigation did not substantiate the use of derogatory terms related to her sex but that he had issued appropriate discipline regarding the tone and profanity of Mr. Stamm's language.  (See ECF Nos. 25 ¶¶ 164-165; 30 ¶¶ 164-165.)

Plaintiff informed Mr. Reffner on July 12, 2013, that she did not believe that she could work for Mr. Stamm but that she would like to work for Defendant in a location that was closer to her home.  (See ECF Nos. 25 ¶¶ 166-167; 30 ¶¶ 166-167, 414; 33 ¶¶ 166-167, 414.)  Mr. Reffner then contacted Mr. Emerick, stating that Plaintiff requested to be assigned elsewhere and that he advised her that Defendant prefers to have confidence that the measures taken are severe enough to avoid any further incidents.  (ECF Nos. 25 ¶ 170; 30 ¶ 170.)  As of July 16, 2013, Mr. Reffner had addressed Plaintiff's requests with Mr. Emerick, but they had not reached a decision on whether to accommodate her.  (ECF Nos. 25 ¶ 171; 30 ¶ 171.)  When Mr. Reffner returned from a vacation on July 22, 2013, he found that Plaintiff's counsel had sent him a letter requesting that Plaintiff be reassigned away from Mr. Stamm in a location that would not be so far away that she would be unable to travel to her work location.  (ECF Nos. 25 ¶¶ 172-173; 30 ¶¶ 172-173.)  A resolution was reached on or around July 29, 2013, and on Plaintiff returned to

work on August 5, 2013, with Larry Shields's crew at a site in DuBois, which was not a significant distance away from her home. (ECF Nos. 25 ¶¶ 175, 177; 30 ¶¶ 175, 177.) Plaintiff received the same rate of pay as a laborer following her reassignment to Mr. Shields's crew. (ECF Nos. 25 ¶ 181; 30 ¶ 181.) She has not had any contact with Mr. Stamm since June 25, 2013. (ECF Nos. 25 ¶ 176; 30 ¶ 176.)

After Mr. Stamm drove through Plaintiff's job site on October 3, 2013, Plaintiff advised Mr. Reffner that as long as someone informed her when Mr. Stamm would be on the site, "it would be fine," and she wanted to know why he was there so she did not feel uneasy. (*See* ECF Nos. 25 ¶¶ 185-186; 30 ¶¶ 185-186; 33 ¶¶ 185-186.) Plaintiff told Mr. Reffner that the conditions on the crew were otherwise generally favorable. (ECF Nos. 25 ¶ 187; 30 ¶ 187.) Following the conversation, Mr. Reffner spoke with Mr. Miller, who confirmed that Mr. Stamm would be completed with the project and that Carl Stamm would work on the project on October 7. (ECF Nos. 25 ¶ 188; 30 ¶ 188.) When Mr. Reffner advised Plaintiff that Carl Stamm would need to come through to pave the project, she stated that she had not had a problem with Carl Stamm. (ECF Nos. 25 ¶ 189; 30 ¶ 189.) Mr. Reffner informed Mr. Miller that he would need to be notified at any point in which Mr. Stamm would be near Plaintiff's job site so that he could notify Plaintiff. (ECF Nos. 25 ¶ 190; 30 ¶ 190.)

On or around October 13, 2013, after receiving an anonymous letter, Mr. Reffner began an investigation regarding Mr. Stamm's behavior and learned that Mr. Stamm was swearing and screaming on the job. (*See* ECF Nos. 25 ¶¶ 193-194; 30 ¶¶ 193-194; 33 ¶ 193.) As a result of his investigation, Mr. Reffner determined that Mr. Stamm had violated the Last Chance Agreement. (ECF Nos. 25 ¶195; 30 ¶ 195.) On October 24, 2013, Mr. Reffner contacted Plaintiff,

advising her that Mr. Stamm had been terminated and inquiring whether she had any other issues that needed to be addressed. (ECF Nos. 25 ¶ 196; 30 ¶ 196.)

Viewing the facts in the light most favorable to Plaintiff, the Court cannot conclude that Defendant did not exercise reasonable care in handling Plaintiff's complaints regarding Mr. Stamm in 2013. When Plaintiff raised her complaints, Defendant responded promptly and accommodated Plaintiff's requests. As discussed above, Plaintiff's complaints did not reveal that Mr. Stamm engaged in sexual harassment. Although Defendant's investigation established that Plaintiff's sexual harassment complaints were unsubstantiated, it entered into a Last Chance Agreement with Mr. Stamm regarding his use of profanities on the job site. When Mr. Stamm violated the agreement, Defendant terminated his employment.

The undisputed facts, in conjunction with Defendant's adequate procedures regarding sexual harassment complaints, establish that Defendant exercised reasonable care. *See, e.g.*, *Andreoli*, 482 F.3d at 644 (finding the employer's actions were adequate where management investigated the employee's complaint and spoke to the alleged harasser about the allegations); *Knabe*, 114 F.3d at 413 (concluding that the defendant's remedial action was adequate because although "[it] was unable to make a finding that harassment occurred . . . [it] nevertheless took remedial action"); *Young v. City of Phila. Police Dep't*, 94 F. Supp. 3d 683, 700 (E.D. Pa. 2015) (finding that the defendant exercised reasonable care by investigating the plaintiff's allegations); *Johnson-Harris v. AmQuip Cranes Rental, LLC*, 2015 U.S. Dist. LEXIS 88736, at *24-25 (E.D. Pa. July 8, 2015) ("Even though, under Third Circuit precedent, the Defendants' investigation alone qualifies as sufficiently adequate remediation, the Defendants went even a step further to remedy the situation in offering to transfer [the plaintiff]."); *Cacciola*, 23 F. Supp. 3d at 531

(holding that the defendant acted reasonably because it had adequate procedures in place and offered to start corrective procedures); *Smith v. East Penn Mfg.*, No. 12-CV-6032, 2014 U.S. Dist. LEXIS 110378, at *38-39 (E.D. Pa. Aug. 8, 2014) (concluding that the defendant exercised reasonable care by accommodating the plaintiff's requests for shift transfers and by immediately investigating her allegations); *Amati*, 2007 U.S. Dist. LEXIS 82079, at *56 (determining that the defendant took reasonable care to prevent and correct harassment by meeting with the plaintiffs three days after they reported a complaint, informing the harasser of the allegations, and conducting an investigation). *See also Chapman v. Progress Rail Servs. Corp.*, No. 14-CV-5680, 2015 U.S. Dist. LEXIS 156861, at *22-23 (W.D. Wash. Nov. 19, 2015) (finding that the defendant exercised reasonable care by promptly beginning an investigation and placing the plaintiff on paid leave); *Reed v. Gulf Coast Cmty. College*, No. 5:09-CV-237, 2010 U.S. Dist. LEXIS 75412, at *50-55 (N.D. Fla. June 29, 2010) (concluding that the defendant exercised reasonable care by conducting an investigation and entering into a last chance agreement with the harasser).

During the 2014 season, Plaintiff contacted Mr. Hileman to express her concern regarding the amount of time that it took her to drive to Hustontown and to report that she had heard that Mr. Eyerly and Mr. Crain, who were less senior than her, were working closer to her home. (ECF Nos. 25 ¶ 214; 30 ¶ 214.) Mr. Hileman contacted Ms. Ankney, stated that Plaintiff had complaints about her assignment, and made arrangements for Plaintiff to be reassigned to work closer to her home beginning on or around May 28, 2014. (ECF Nos. 25 ¶ 218; 30 ¶ 218.) Within one week of contacting Mr. Hileman, Plaintiff was assigned to work at a location closer to her home. (ECF Nos. 25 ¶ 219; 30 ¶ 219.) The new assignment was for a project occurring in

Snyder Township and consisted of two days of work on May 15 and 19 in 2014.  (ECF Nos. 25 ¶ 220; 30 ¶ 220.)

On May 28, 2014, Plaintiff was assigned to a project in the Lawrence Township/Clearfield area, which was closer to her home.  (ECF Nos. 25 ¶ 231; 30 ¶ 231.)  After receiving the Hurt Feelings Report from Mr. McClure that day, Plaintiff continued to work a nine-hour day, reported for work on May 29, 2014, but was sent home along with the rest of the crew due to rain, and reported for work on May 30, 2014.  (*See* ECF Nos. 25 ¶¶ 234-235, 259; 30 ¶¶ 234-235, 259.)  On May 30, 2014, Plaintiff refused to sign a Check of Facilities form and informed Carl Stamm that Mr. McClure had given her the Hurt Feelings Report.  (ECF Nos. 25 ¶ 235; 30 ¶ 235.)  Carl Stamm contacted Mr. Flood, who came to the job site to speak with Plaintiff that day.  (ECF No. 25 ¶ 236; 30 ¶ 236.)  Mr. Brunnhuber discussed the incident with Plaintiff, Carl Stamm, Mr. Flood, and Mr. McClure on May 30, 2014.  (ECF Nos. 25 ¶ 242; 30 ¶ 242.)  On June 2, 2014, Mr. Brunnhuber conducted interviews on the job site with Plaintiff, Mr. McClure, Mr. Becker, and Ms. Quick.  (ECF Nos. 25 ¶ 243; 30 ¶ 243.)  Plaintiff complained about her previous assignment in Hustontown, claiming that she had heard that less senior men were being paid at a laborer rate in an area closer to her home and stating that she wanted to be on her old crew.  (ECF Nos. 25 ¶ 246; 30 ¶ 246.)

Plaintiff continued to report to the same job site every day that work was available from June 2 through June 16, 2014, with the exception of one Sunday that she missed due to having water problems at her home.  (ECF Nos. 25 ¶ 260; 30 ¶ 260.)  Unbeknownst to Plaintiff at the time, Mr. Brunnhuber was released from his employment on June 6, 2014.  (ECF Nos. 30 ¶ 445; 33 ¶ 445.)  Plaintiff decided to resign from her position on the morning of June 17, 2014,

approximately two weeks after Mr. Brunnhuber had visited the site to investigate. (ECF Nos. 25 ¶¶ 264, 266; 30 ¶¶ 264, 266.) Plaintiff declined to participate in an exit interview. (*See* ECF Nos. 25 ¶¶ 272-273, 276; 30 ¶¶ 272-273, 276.) Mr. Gathers and Mr. Emerick, in the absence of Mr. Brunnhuber, continued to investigate by e-mailing Mr. Hileman and Jeff Miller on June 19 and 20 of 2014, and these messages were forwarded to Mr. Reffner when he returned to work for Defendant as the Human Resource Manager. (ECF Nos. 25 ¶ 277; 30 ¶ 277.)

Viewing the facts in the light most favorable to Plaintiff, the Court cannot conclude that Defendant did not exercise reasonable care in handling Plaintiff's complaint during the 2014 season. When Plaintiff raised her complaints, Defendant responded promptly and accommodated Plaintiff's requests. Defendant was in the process of investigating Plaintiff's complaint regarding the Hurt Feelings Report when she decided to voluntarily resign, only two weeks after Mr. Brunnhuber had visited the site to investigate. *See, e.g.*, *Smith*, 2014 U.S. Dist. LEXIS 110378, at *38-40 (concluding that the defendant exercised reasonable care by granting the plaintiff's request to transfer to a distribution center on the more desirable shift); *Amati*, 2007 U.S. Dist. LEXIS 82079, at *56 (holding that the defendant exercised reasonable care by conducting a thorough investigation); *Kent v. Henderson*, 77 F. Supp. 2d 628, 634 (E.D. Pa. 1999) (determining that the defendant took prompt remedial action by agreeing to the plaintiff's request for a voluntary transfer).

Second, Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. According to Plaintiff, Mr. Stamm began to sexually harass her in 2010. (ECF No. 30 ¶ 355.) Plaintiff did not report Mr. Stamm's conduct until "the beginning of the 2011 construction season," at which time she and

two of her male co-workers discussed Mr. Stamm's use of profanity and the mooning incident with Mr. Flood and Ms. Dick.  (*See* ECF Nos. 25 ¶¶ 68, 70-72; 30 ¶¶ 68, 70-72, 373, 375; 33 ¶ 373, 375.)  "Such a delay, without sufficient explanation, is unreasonable." *Cacciola*, 23 F. Supp. 3d at 531 (finding that the plaintiff's failure to file a report for nine months was unreasonable); *see also Rodriguez v. Auto Zone*, No. 12-CV-3916, 2014 U.S. Dist. LEXIS 4593, at *32 (D.N.J. Jan. 14, 2014) (concluding that the plaintiff's failure to take advantage of the defendant's preventative measures for four months without explanation was unreasonable).  Additionally, although Defendant's Check of Facilities form allows employees to file their reports confidentially, Plaintiff refused to sign it, asserting that she feared retaliation.  (ECF Nos. 25 ¶¶ 72-73; 25-7 at 42; 30 ¶¶ 72-73.)  The Court therefore finds that Plaintiff unreasonably failed to take advantage of Defendant's preventative measures.  *See Cacciola*, 23 F. Supp. 3d at 532 (rejecting the plaintiff's argument that she did not report sexual harassment because "she presents no evidence that this fear was grounded in anything") (citing *Gawley*, 276 F.3d at 312 (affirming summary judgment because the failure to report harassment "constitute[d] an unreasonable failure to take advantage of the [employer's] corrective procedures")).  *See also Anderson v. Deluxe Homes of Pa, Inc.*, 131 F. Supp. 2d 637, 650 (M.D. Pa. 2001) ("While courts in this circuit have given little guidance on the second prong of the affirmative defense, we note that courts in other circuits have held that failing to complain due solely to a subjective fear of termination is unreasonable as a matter of law.").  Similarly, and as discussed below in relation to Plaintiff's claim for constructive discharge, Plaintiff failed to take advantage of Defendant's preventative measures when she voluntarily resigned while Defendant was in the process of investigating her complaint regarding the Hurt Feelings Report.

In sum, because the undisputed facts demonstrate that Defendant exercised reasonable care to prevent and promptly correct any sexually harassing behavior and because Plaintiff unreasonably failed to take advantage of Defendant's preventative opportunities, Defendant has established the *Faragher-Ellerth* affirmative defense. Plaintiff has therefore only been able to minimally establish the first prong, as discussed *supra*, and the third prong, which the parties do not dispute, of her hostile work environment claim. Her claim therefore fails as a matter of law, and the Court will grant Defendant's motion for summary judgment.

### 2. Constructive Discharge

Constructive discharge represents a "'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147-48 (2004). "Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006). Thus, a claimant may argue constructive discharge when an employer was, or should have been, aware of harassment and did nothing to stop it. *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 168 (3d Cir. 2001) (quoting *Aman*, 85 F.3d at 1084-85). The relevant test is whether "'a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (quoting *Duffy*, 265 F.3d at 167). Factors frequently considered in making the above determination include: threats of termination or suggested resignation, demotions, reductions in pay and benefits, transfer to less desirable positions, alteration of job responsibilities, and/or poor performance evaluations. *Id.* at 503 (quoting *Clowes v. Allegheny Valley Hosp.*, 991 F.2d

1159, 1161 (3d Cir. 1993)).  Moreover, "[t]o make out a constructive discharge claim, a plaintiff must show greater severity or pervasiveness than the minimum required to prove a hostile working environment."  *Greer*, 590 F. App'x at 175 n.7 (citing *Spencer*, 469 F.3d at 317 n.4).

As discussed extensively above, Defendant exercised reasonable care to prevent and correctly promptly any sexually harassing behavior that occurred.  Plaintiff cannot establish that there were any threats of termination or suggested resignation, demotions, reductions in pay and benefits, transfer to less desirable positions, alteration of job responsibilities, and/or poor performance evaluations.  Indeed, the undisputed material facts establish that Defendant granted Plaintiff paid leave while it conducted its investigation in 2013, granted Plaintiff's requests to transfer to another job site that was closer to her home, and ensured that she received the same rate of pay following her reassignment.  Plaintiff confirmed that "it would be fine" if Mr. Stamm drove through her job site as long as someone informed her when he would be present, and she stated that the conditions of her reassignment were otherwise favorable.  (*See* ECF Nos. 25 ¶¶ 185-187; 30 ¶¶ 185-187; 33 ¶¶ 185-187.)  The Court further notes that Plaintiff cannot use Mr. Stamm's conduct as the basis for her resignation because she had not had any contact with Mr. Stamm since June 25, 2013, and Defendant terminated Mr. Stamm's employment in October 2013 when he violated the Last Chance Agreement by using profanities on the job.  Plaintiff returned to work for Defendant during the 2014 season.  A reasonable jury therefore could not conclude that the conditions related to Mr. Stamm's behavior were so unpleasant or difficult that a reasonable person would have felt compelled to resign.  *Colwell*, 602 F.3d at 502; *Neely v. McDonald's Corp.*, No. 04-CV-1553, 2007 U.S. Dist. LEXIS 19610, at *25-26

(W.D. Pa. Mar. 20, 2007) (concluding that a constructive discharge did not occur because the plaintiff resigned more than three months after the harassment ceased).

During the 2014 season, Defendant reassigned Plaintiff to a location that was closer to her home when she complained about the commute to her assignment. In granting Plaintiff's reassignment and transfer requests, Defendant did not reduce her pay. Despite Plaintiff's complaints regarding Mr. Eyerly and Mr. Crain, the undisputed facts reveal that Plaintiff worked 153 hours, including 11.5 hours of overtime, and had an average hourly pay of $24.601 in May 2014. (ECF Nos. 25 ¶ 228; 30 ¶ 228.) During the same month, Mr. Eyerly worked 81.5 hours, received no overtime, and had an average hourly pay rate of $21.373; Mr. Crain worked 90 hours, received no overtime, and had an average hourly rate of $20.862. (ECF Nos. 25 ¶¶ 229-230; 30 ¶¶ 229-230.)

Plaintiff cites to the Hurt Feelings Report and her co-workers' conduct in mocking her as the basis for her resignation in June 2014. After Plaintiff received the Hurt Feelings Report, Plaintiff waited two days before she made a report. Defendant began investigating the report that day and was continuing its investigation when Plaintiff tendered her resignation. The parties' dispute regarding whether Plaintiff indicated that she could not continue working on the crew, (*see* ECF Nos. 25 ¶ 244; 30 ¶ 244), is immaterial because Plaintiff acted unreasonably by resigning while Defendant was continuing its investigation. *See, e.g.*, *Clowes*, 991 F.2d at 1161 (explaining that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option"); *James-Frederick v. Frenchman's Reef & Morning Star Marriott Beach Resort*, No. 12-CV-108488, 2013 U.S. Dist. LEXIS 108488, at *18 (D.V.I. Aug. 1, 2013) (granting summary judgment as to constructive

discharge because "in resigning the very same day that [the defendants] made their decision after investigating Plaintiff's complaints, Plaintiff does not provide any facts demonstrating that she gave her employer reasonable time to resolve the problem"). *See also Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890-91 (8th Cir. 1998) (granting summary judgment as to the plaintiff's constructive discharge claim where she resigned without giving the defendant an opportunity to respond to her complaint).

As discussed above, Plaintiff's receipt of the Hurt Feelings Report, while inappropriate, is insufficient to rise to the level of establishing a hostile work environment that was severe and pervasive. Similarly, as discussed above, Plaintiff's allegations that her co-workers made fun of her and mimicked her while she was being trained to use a roller are insufficient to establish a hostile work environment. Plaintiff's claim for constructive discharge therefore fails as a matter of law. *See Greer*, 590 F. App'x at 175 n.7 ("To make out a constructive discharge claim, a plaintiff must show greater severity or pervasiveness than the minimum required to prove a hostile working environment."). *See also Heasley*, 2009 U.S. Dist. LEXIS 45035, at *24 (granting summary judgment because "[t]he timeline of allegedly improper events is sporadic and relatively benign, rather than the type of unrelenting, egregious conduct typically found sufficient to support a cause of action"); *Seldomridge*, 2001 U.S. Dist. LEXIS 9491, at *38 (granting summary judgment because the plaintiff failed to show that the defendant made her working conditions intolerable and because it was unreasonable to assume that she had no other option but to quit).

### 3.  Retaliation

Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for a covered employer "to discriminate against" an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder.  42 U.S.C. § 2000e-3(a).  To establish a violation of Title VII's anti-retaliation provision, a plaintiff must show that: (1) she engaged in conduct entitled to statutory protection; (2) the employer responded by taking a "materially adverse" action (or a series of "materially adverse" actions) against her; and (3) there was a causal connection between her statutorily-protected conduct and the defendant's "materially adverse" action (or series of "materially adverse" actions).  *Estate of Oliva v. Dept. of Law & Public Safety*, 604 F.3d 788, 798 (3d Cir. 2010).  An adverse employment action means that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Burlington*, 548 U.S. at 68).  Title VII's retaliation provision is broader than its discrimination provision, and is not limited to employment-related or workplace actions.  *Burlington*, 548 U.S. at 61.

With respect to the causal connection element, the court may consider "a broad array of evidence."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).  "Unusually suggestive" temporal proximity between protected activity and adverse action may be sufficient to establish an inference of causality.  *Id.* at 280; *see also Breeden*, 532 U.S. at 273-74.  However, "the mere fact that adverse employer action occurs after a complaint will ordinarily be

insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."  *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997), *abrogated on other grounds*, *Burlington*, 548 U.S. at 60.  "If the temporal proximity is not unusually suggestive, a court may consider whether the record evidence, as a whole, is sufficient to raise an inference of causation."  *Kahan v. Slippery Rock Univ. of Pennsyvania*, 50 F. Supp. 3d 667, 701 (W.D. Pa. 2014). Such record evidence may include "evidence of ongoing antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus.  *Id.* (citing *Farrell*, 206 F.3d at 280).

Plaintiff's filing of a complaint with the EEOC satisfies the first element of her claim for retaliation.  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).  There is no dispute that Plaintiff filed her complaint with the EEOC in June or July 2013, approximately one year before Plaintiff resigned.  (ECF Nos. 25 ¶ 6; 30 ¶¶ 6, 485; 33 ¶ 485.)  In her complaint, Plaintiff asserted claims against Defendant for a hostile work environment, disparate treatment, and a failure to promote.  (ECF Nos. 30 ¶ 485; 33 ¶ 485.)  Plaintiff later amended her complaint to add claims for wrongful termination and retaliation.  (ECF Nos. 30 ¶ 486; 33 ¶ 486.)

According to Plaintiff, she suffered two adverse actions in 2014, "namely the refusal to call her back to work and the activities following the Hurt Feelings Report."  (ECF No. 29 at 77.) Specifically, Plaintiff asserts that Defendant took a materially adverse action against her because her crew started early in the season with younger, less experienced males and because Defendant submitted her to roller work.  (*Id.* at 78-79.)

The Court finds that Plaintiff has failed to satisfy the second element of her claim for retaliation because there is no evidence that Defendant took a "materially adverse" action against Plaintiff by calling her back to work for the 2014 season. The only evidence upon which Plaintiff relies to support her argument that younger, less experienced males started early in the season is her testimony that she contacted Mr. Flood in March 2014 because she was unable to sign up for unemployment compensation. (ECF No. 30-2 at 22-23.) Mr. Flood told Plaintiff that she could work on a project in DuBois but stated that he was unsure of the starting date because of the weather. (*Id.* at 23.) Either Mr. Flood or Mr. Shields followed up with Plaintiff to provide her with the dates of the job, and Plaintiff reported to work on April 28, 2014. (*Id.* at 23, 26.) Plaintiff states in her affidavit, "I learned through conversations with coworkers that my old crew . . . had begun working on a large project in State College, Pennsylvania, using new traffic flaggers and laborers, all of whom were male, all of whom were younger and less experienced than me." (ECF No. 30-8 at 12.) Plaintiff does not provide any facts regarding the names of the "younger and less experienced" males. Moreover, the undisputed evidence reveals that Defendant's male employees were called back to work on the same date as Plaintiff or later. Specifically, Mr. Becker returned on April 28, 2014, (ECF No. 33-7 at 71); Mr. Harzinski returned on April 28, 2014, (*id.* at 73); Dean Haversack returned on April 28, 2014, (*id.* at 74); Robert Maines returned on April 28, 2014, (*id.* at 76); Mr. Flood returned on April 28, 2014, (*id.* at 77); John Stasko returned on April 28, 2014, (*id.* at 78); Neil Wilson returned on April 28, 2014, (*id.* at 79); Barry Berg returned on April 28, 2014, (*id.* at 80); Mr. Hutchinson returned on May 5, 2014, (*id.* at 81); James Lewis returned on May 5, 2014, (*id.* at 82); and Mr. Buynak returned on April 28, 2014, (*id.* at 83). The Court therefore will not credit Plaintiff's unsubstantiated statement.

*See, e.g., Phifer v. Sevenson Envtl. Servs.*, No. 11-CV-169, 2014 U.S. Dist. LEXIS 123897, at \*12-13 (D. Del. Sept. 5, 2014) (granting summary judgment as to the plaintiff's retaliation claim because the evidence revealed that his other co-workers were also affected by a seasonal lay-off).

The Court also finds that there is no evidence that Defendant took a "materially adverse" action against Plaintiff by training her on roller work. In support of her argument, Plaintiff relies upon her statement that she was directed to operate the equipment on her own, at night, because she had been "seeking a 'man's job.'" (ECF No. 30-8 at 15.) However, Plaintiff testified that Jeff Heilman had contacted her about a job in Somerset. (ECF No. 30-9 at 32.) When Mr. Heilman said, "I hear you don't want to run roller," Plaintiff responded, "Not that I don't want to run roller, [but] I wasn't trained the way you told me I would be trained." (*Id.*) Mr. Flood then contacted Plaintiff and said "they would let me ride on [the] roller for a few nights on night shift to learn how to run a roller." (*Id.*) When Plaintiff arrived at the job, she was told to run the small roller "and that was their training program on the roller." (*Id.*) Even in viewing these facts in the light most favorable to Plaintiff, the Court cannot conclude that Defendant took a materially adverse action against Plaintiff by permitting her to train on a roller during the night shift.

Even if Plaintiff could establish that Defendant took materially adverse actions against her by calling her back to work for the 2014 season and by training her on roller work, she cannot demonstrate a causal connection between her statutorily-protected conduct and Defendant's actions. As discussed above, Plaintiff filed her complaint with the EEOC in June or July 2013. (ECF Nos. 25 ¶ 6; 30 ¶¶ 6, 485; 33 ¶ 485.) Viewing the facts in the light most favorable to Plaintiff, the earliest time period that Defendant's materially adverse action could

have occurred was in March 2014, eight months after Plaintiff filed her complaint. Such a lengthy period of time is not suggestive of a causal connection between the events. *See, e.g.*, *Flory v. Pinnacle Health Hospitals*, 346 Fed. Appx. 872, 877 (3d Cir. 2009) (noting that a span of mere months, let alone years, between protected activity and an adverse employment action is insufficient to raise an inference of causation and defeat summary judgment); *Theriault v. Dollar Gen.*, 336 Fed. Appx. 172, 175 (3d Cir. 2009) (finding that the plaintiff did not establish causation where she was terminated several months after her alleged protected activity); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (holding that a three-month gap between protected activity and an adverse action, without more, does not create an inference of causation and defeat summary judgment); *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (concluding that two months between protected activity and alleged adverse action does not necessarily give rise to an inference of causation). *See also Amati*, 2007 U.S. Dist. LEXIS 82079, at *62 (dismissing the plaintiff's retaliation claim that was based, in part, on the defendant's delay in training her as an assistant roller).

### 4. Punitive Damages

As noted above, Plaintiff seeks an award of punitive damages. Defendant seeks summary judgment, arguing that Plaintiff cannot establish that Defendant engaged in a discriminatory practice with malice or with reckless indifference to Plaintiff's federally protected rights because it made good-faith efforts to comply with Title VII through the adoption and implementation of its unlawful harassment policies and procedures. (ECF No. 26 at 96-97.) Because judgment will be granted to Defendant on all of Plaintiff's claims, the punitive damages claim will be dismissed.

**VI.    Conclusion**

For the foregoing reasons, Plaintiff has not provided sufficient evidence, when viewed in the light most favorable to her as the non-moving party, to allow the Court to determine that she has established a prima facie case for hostile work environment, constructive discharge, and retaliation claims under Title VII.   Accordingly, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's Title VII claims for hostile work environment, constructive discharge, and retaliation.   Defendant's motion to strike portions of Plaintiff's affidavit is **GRANTED in part** and **DENIED in part**, and Defendant's motion to strike Monica Graham's affidavit is **DENIED**.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SUZETTE M. BUMBARGER,** | ) | **CIVIL ACTION NO. 3:14-137** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NEW ENTERPRISE STONE AND** | ) | |
| **LIME CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

**AND NOW**, this 17th day of March, 2016, upon consideration of Defendant New Enterprise Stone and Lime Co., Inc.'s motion to strike portions of Plaintiff's affidavit (ECF No. 35), motion to strike Monica Graham's affidavit (ECF No. 37), and motion for summary judgment (ECF No. 24), and upon consideration of the parties' briefing of Defendant's motions (ECF Nos. 25, 26, 29, 30, 33, 34, 36, 38, 39, 40), and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED** as follows:

(1) Defendant New Enterprise Stone and Lime Co., Inc.'s motion to strike portions of Plaintiff's affidavit (ECF No. 35) is **GRANTED** as to paragraph 95 and is **DENIED** in all other respects.

(2) Defendant New Enterprise Stone and Lime Co., Inc.'s motion to strike Monica Graham's affidavit (ECF No. 37) is **DENIED**.

(3) Defendant New Enterprise Stone and Lime Co., Inc.'s motion for summary judgment (ECF No. 24) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Defendant New Enterprise Stone and Lime Co., Inc. and against Plaintiff Suzette M. Bumbarger and shall mark this case closed.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE